The TRAVELERS INDEMNITY COMPANY, Plaintiff–Appellee,

v.

SCOR REINSURANCE COMPANY, Defendant–Appellant.

No. 800, Docket 94–7411.

United States Court of Appeals, Second Circuit.

Argued Jan. 27, 1995.

Decided Aug. 7, 1995.

---

Henry H. Rossbacher, Rossbacher & Associates, Los Angeles, CA (Tracy W. Young, Rossbacher & Associates, Los Angeles, CA, Charles F. Corcoran, III, Corcoran, Mallin & Aresco, P.C., Hartford, CT, of counsel), for defendant-appellant.

John M. Nonna, Werner & Kennedy, New York City (Larry P. Schiffer, John S. Pak, of counsel) for plaintiff-appellee.

Before: VAN GRAAFEILAND, WINTER, and LEVAL, Circuit Judges.

WINTER, Circuit Judge:

This appeal involves a dispute arising out of a reinsurer's refusal to pay claims by a primary insurer under a reinsurance contract. Scor Reinsurance Company appeals from Judge Nevas's denial of its motion for a judgment notwithstanding the verdict or, alternatively, for a new trial. Scor claims that the district court erred by finding the contracts at issue ambiguous, by admitting expert testimony regarding industry custom and practice, and by giving the jury prejudicially confusing instructions. Scor further contends that the evidence was insufficient as a matter of law to support the jury's verdict. We affirm.

## BACKGROUND

■ Primary insurers reinsure to diversify risk. The mechanics of reinsurance can be simply described. One insurer (a "ceding insurer") "cedes" all or part of the risk relating to a policy, or a group of policies, to a reinsurer. A portion of risk not "ceded" is "retained." The reinsurer indemnifies the ceding insurer for any liability incurred that is covered by the reinsurance. The relationship created is strictly one of indemnification. The reinsurer has no privity with, and is generally not liable to, the original purchaser of the underlying policy. *See Delta Holdings, Inc. v. National Distillers*, 945 F.2d 1226, 1229 (2d Cir.1991), *cert. denied*, 503 U.S. 985, 112 S.Ct. 1671, 118 L.Ed.2d 390 (1992); *Unigard Sec. Ins. Co., Inc. v. North River Ins.*, 4 F.3d 1049, 1053 (2d Cir.1993).

Reinsurance is feasible only if it costs less than the underlying insurance. *Unigard*, 4 F.3d at 1054. Reinsurers thus generally do not duplicate the functions of the ceding insurers, such as evaluating risks and processing claims. Reinsurers may not even have actuarial expertise. *See Delta*, 945 F.2d at 1229 and 1241. Instead, they rely on their common interests with the ceding insurers and on an industry custom of utmost good faith, including the sharing of information. *See Unigard*, 4 F.3d at 1054 and Steven W. Thomas, Note, *Utmost Good Faith in Reinsurance: A Tradition in Need of Adjustment*, 41 Duke L.J. 1548, 1558–61 (1992). Reinsurers depend on ceding insurers to provide information concerning potential liability on the underlying policies. *See generally Unigard*, 4 F.3d 1049.

There are two broad categories of reinsurance contracts: facultative and treaty. Facultative reinsurance covers part or all of an individual policy. Treaty reinsurance covers specific classes of a ceding insurer's portfolio of contracts. *See Unigard*, 4 F.3d at 1053–4.

The instant case involves two facultative reinsurance policies between Travelers Indemnity Company—the ceding insurer—and

Scor Reinsurance Company—the reinsurer. Travelers had issued a $500,000 primary policy and $5 million excess policy to the Bernhardt Furniture Company. Under a reinsurance contract between Scor and Travelers, Scor was to indemnify Travelers for 90% of the first $1 million in liability under the excess policy and 100% of the remaining $4 million in liability. Travelers did not reinsure the Bernhardt primary policy. The second reinsurance contract between Scor and Travelers concerned a policy issued by Travelers to the Chessie System Railroad. Under that contract, Travelers would receive no indemnification for the first $100,000 of liability under the policy, but Scor would indemnify 90% of the next $400,000.

Both contracts contained an identical notice of occurrence clause. It reads:

C. *Notice of Occurrence.* The Company shall notify the Reinsurer promptly of any occurrence which in the Company's estimate of the value of injuries or damages sought, without regard to liability, might result in judgment in an amount sufficient to involve this certificate of reinsurance. The Company shall also notify the Reinsurer promptly of any occurrence in respect of which the Company has created a loss reserve equal to or greater than fifty (50) percent of the Company's retention specified in item 3 of the Declarations: or, if this reinsurance applies on a contributing excess basis, when notice of claim is received by the company. While the Reinsurer does not undertake to investigate or defend claims or suits, it shall nevertheless have the right and shall be given the opportunity, with the full cooperation of the Company, to associate counsel at its own expense and to join with the Company and its representatives in the defense and control of any claim, suit or proceeding involving this certificate of reinsurance.

The underlying dispute concerns the timeliness of Travelers' notice to Scor of events leading to Travelers' making of a claim under each reinsurance policy. Given the verdict for Travelers, we view the evidence in the light most favorable to it.

In 1986, an action was filed against several defendants, including Bernhardt. Travelers, which had reason to believe that Bernhardt's exposure was minimal, set initial reserves of $175,000. In early 1989, Bernhardt's share of a proposed settlement fund was $250,000, and reserves were accordingly set at that level, which was still within the primary policy's limits. Evidence substantially increasing Bernhardt's exposure to liability was discovered by a defendant's expert whose deposition was completed in September 1989. Travelers raised the reserves to $1 million on October 2, 1989. This loss reserve level was higher than 50% of Travelers's retention under the policy, and Travelers mailed a notice to Scor on October 11, 1989, as specifically required by the notice of occurrence provision. It was received on October 29. Meanwhile, the case was settled on October 13 for $2,800,000. Travelers' share was $1,500,000, the other defendants paying the remaining $1,300,000. Scor denied Travelers' claim for $900,000 on the ground that the notice was untimely.

The Chessie policy became implicated following an accident involving a Chessie trailer. The third-party company hauling the trailer had agreed to use only subcontractors approved by Chessie. Initially, the absence of a relationship between Chessie and the hauler involved in the accident led Travelers to conclude that liability on the policy was unlikely. Consequently, Travelers set an initial reserve at $17,500, an amount less than the trigger for the reinsurance. Shortly before trial, however, it was discovered that Chessie had known about the hauler for some time before the accident, and that the hauler was indeed a subcontractor covered by the underlying policy. Two and a half weeks after that discovery, Travelers raised the reserve to $1,250,000 and assumed Chessie's defense. Five days after that, on January 10, 1990, Travelers sent notice to Scor. On January 16, the case was settled with the two main plaintiffs for $1,300,000 and $30,000 respectively. Scor denied Travelers' claim on the ground that the notice was untimely.

At trial, Robert Hall testified as an expert for Travelers. Scor objected to the admission of his testimony on industry custom and practice regarding the giving of notice. At the close of Travelers' case, Scor moved for a

directed verdict on the ground that Travelers failed to disprove prejudice to Scor because of untimely notice. At no time did Scor move for a directed verdict or a judgment as a matter of law on the issue of whether notice was untimely under the notice of occurrence clause. Scor requested a jury instruction that the notice of occurrence clause was not ambiguous and objected to the district court's instruction that it was ambiguous as a matter of law. Scor did not object to the district court's instructions on contract interpretation. The jury found that Travelers had provided Scor with timely notice regarding both claims. Subsequently, the district court denied Scor's motion for a judgment notwithstanding the verdict and, alternatively, for a new trial.

## DISCUSSION

The parties agree that Connecticut law governs this diversity case. The principal issue is whether the notice of occurrence clause was ambiguous as a matter of law. Clearly, it was. A contract is ambiguous under Connecticut law if its meaning regarding the point at issue is not clear simply from reading it, and a trier of fact interpreting the document is thus forced to choose between two or more possible meanings. *Cf. Ballato v. Board of Educ.*, 633 A.2d 323, 328 (Conn. App.Ct.1993), *cert. denied*, 228 Conn. 923, 638 A.2d 37 (1994).

In the context of the present dispute, there is surely more than one plausible meaning of the phrase "might result in judgment in an amount sufficient to involve this certificate of reinsurance." Scor itself does not argue that every occurrence that might conceivably implicate the reinsurance—no matter how remote the possibility—results in an obligation to give notice. Not only would that be administratively impossible for Travelers, but it would also be of no aid to Scor, which would be unable to separate the realistic possibilities of exposure from the remote possibilities. Moreover, the provision specifically requiring notice of an occurrence resulting in a loss reserve of at least 50% of the retention would be superfluous under such a reading. There is thus considerable room for differing interpretations of whether, at various times, the

events concerning the liability of Bernhardt or Chessie "might result in a judgment in an amount sufficient to involve" the reinsurance. Scor itself admits that under the notice of occurrence provision, the primary insurer must make judgment calls both as to potential liability and the amount of likely damages.

Scor claims also that the district court erroneously admitted evidence of the custom and practice of the reinsurance industry. We disagree. A court may admit extrinsic evidence to interpret ambiguous provisions of contracts. *Ballato*, 633 A.2d at 328. Parties may offer evidence of custom or practice to interpret the meaning of a term used in a contract. *See Gelb v. Automobile Ins. Co.*, 168 F.2d 774, 775 (2d Cir.1948). Indeed, it is hard to imagine how the instant case could have been decided without admitting evidence of custom and practice. There is, of course, a distinction between using extrinsic evidence to interpret the contract and using it to alter the meaning of the contract. *Gelb*, 168 F.2d at 775 (finding evidence explaining—not changing—meaning of words of contract is admissible). To be admissible, evidence must thus be relevant to interpret the ambiguous provision and not an effort to persuade the jury to ignore the contract. Hall's testimony as to reinsurance industry custom and practice was, therefore, admissible to the extent it was relevant to the meaning of the contract.

Scor argues that much of Hall's testimony concerned industry custom and practice under notice provisions different from that quoted above and to that extent should have been excluded. Some of his testimony did concern notice provisions in general use before the one in question. However, his testimony was that industry custom and practice were the same before and after notice of occurrence provisions such as Scor's came into general use. Furthermore, Hall's evidence of industry custom was admissible to rebut Scor's contention, pleaded as an affirmative defense, that Travelers had acted in bad faith. There was thus no abuse of discretion by the district court in allowing the testimony.

■ Finally, Scor claims that the jury instructions were confusing and erroneous. The district court instructed the jury to weigh the testimony presented by the various experts, stating, "it is your job and your function to resolve th[e] disagreement [between the experts]." The jurors were told that they should resolve the disagreement between the experts "the same way that you decide other fact questions and the same way you decide whether to believe ordinary witnesses, so-called nonexpert witnesses." The jurors were not given an explicit instruction that Hall's testimony was relevant only for purposes of interpreting the contract and could not be used to substitute general custom and practice for the contract. Scor asserts that the lack of any such instruction calls for a new trial.

No particularized request for such an instruction was made to the district court. Scor contends that it preserved the claim with its objection to the jury charge that the contract was ambiguous as a matter of law. This objection, Scor submits, encompassed all of the jury instructions flowing from the legal conclusion that the contract was ambiguous, including instructions regarding the custom and practice of the reinsurance industry. We disagree.

■ An objection to a ruling does not serve as a proxy for objections relating to different issues that arise because of that ruling. Once the district court found the contract ambiguous and held extrinsic evidence admissible, Scor was obliged by Fed. R.Civ.P. 51 to raise any objection to jury instructions regarding the use to which it might put such evidence unless that objection was subsumed in its prior contentions regarding the lack of ambiguity and inadmissibility of extrinsic evidence. Rule 51 requires that any claim of error regarding jury instruction must be preserved by "stating distinctly the matter objected to." *See also Brenner v. World Boxing Council,* 675 F.2d 445, 456 (2d Cir.), *cert. denied,* 459 U.S. 835, 103 S.Ct. 79, 74 L.Ed.2d 76 (1982) (Rule 51 requires party to object before jury retires to preserve jury instruction challenge). This requirement allows the trial court to correct errors before the jury begins its delibera-

tions. *See, e.g., Gordon v. Degelmann,* 29 F.3d 295, 298 (7th Cir.1994) ("Rule 51 requires the parties to draw the court's attention to problems so that they may be corrected before the jury begins to deliberate."); *Hegger v. Green,* 646 F.2d 22, 27 (2d Cir. 1981). At no time was Judge Nevas asked to clarify the instructions regarding the jury's consideration of industry custom and practice.

■ Because Scor failed to preserve its claim, we review the jury charge only for "fundamental error." Fundamental error is narrower than the plain error doctrine applicable to criminal cases. *See* Fed.R.Crim.P. 52. Fundamental error is "an error so serious and flagrant that it goes to the very integrity of the trial." *Modave v. Long Island Jewish Medical Ctr.,* 501 F.2d 1065, 1072 (2d Cir.1974). In the past, we have reversed jury charges that "deprived the jury of adequate legal guidance to reach a rational decision." *Werbungs v. Collectors' Guild, Ltd.,* 930 F.2d 1021, 1026 (2d Cir. 1991).

■ However, there was nothing close to fundamental error in the present case because the charge read as a whole clearly informed the jury that the contracts governed the dispute. The district court told the jury: "Scor disputes that Travelers complied with their certificates on the ground that Travelers failed to give notice in accordance with the terms of the facultative reinsurance certificates. You must determine whether Travelers complied with the notice provisions of those two certificates." This instruction clearly stated that the notice of occurrence provision was the sole issue. It may be that, if requested, a more precisely worded instruction would have been given regarding the use of evidence of industry practice and custom, but it is a very considerable stretch to speculate that the lack of such an instruction affected the outcome, much less constituted fundamental error.

■ Scor's claim that the evidence at trial was legally insufficient to show timely notice is meritless. Scor's failure to request a directed verdict on this ground triggers an unusually strict standard on this issue, *i.e.,*

Scor must show that the jury was not adequately instructed on an essential element of the case. *Hilord Chem. Corp. v. Ricoh Elec.*, 875 F.2d 32, 38 (2d Cir.1989). Scor has failed to meet this standard. Travelers produced evidence showing that unanticipated events determined the timing of its notice to Scor. That was sufficient to allow the jury to find that the notice given was timely under the notice of occurrence provision.

We therefore affirm.