MACQUESTEN GENERAL CONTRACTING, INC., Plaintiff,

v.

HCE, INC. and John J. Hildreth, Defendants.

HCE, Inc. and John J. Hildreth, Third–Party Plaintiffs,

v.

Palmer Court Associates, LLC, Rella Fogliano, Sabino Fogliano, and American Motorists Insurance Company, Third–Party Defendants.

No. 99 Civ. 8598(JCF).

United States District Court, S.D. New York.

Dec. 1, 2003.

438

**440**

Peter S. Herman, Esq., McLaughlin & Stern, LLP, New York City, for MacQuesten General Contracting, Inc., Palmer Court Associates, LLC, Rella Fogliano, and Sabino Fogliano.

Joseph P. Paranac Jr., Esq., Robyn M. Gnudi, Esq., St. John & Wayne LLC, Newark, NJ, for HCE, Inc. and John J. Hildreth.

Theodore M. Baum, Ernstrom & Dreste, LLP, Rochester, NY, for American Motorists Ins. Co.

*MEMORANDUM OPINION
AND ORDER*

FRANCIS, United States Magistrate Judge.

This case arises from a dispute between a general contractor and a subcontractor. The general contractor, MacQuesten General Contracting, Inc. ("MacQuesten"), brought suit alleging that the subcontractor, HCE, Inc. ("HCE") failed to complete the work required under contracts between them. HCE counterclaimed, asserting that MacQuesten had locked it out of the worksite and had failed to make payment for much of the work that was done. HCE also filed third-party claims against the owner of the property, Palmer Court Associates, LLC ("Palmer Court"), and a surety, American Motorists Insurance Company ("AMIC") for foreclosure of a mechanic's lien against the property and against a bond issued by AMIC. The case proceeded to a jury trial over which I presided upon consent of the parties pursuant to 28 U.S.C. § 636(c).

1. "Tr." refers to the trial transcript.

HCE prevailed at trial. The jury rejected MacQuesten's claims and awarded HCE substantial damages on its counterclaims. The parties reserved issues concerning the mechanic's lien for subsequent determination by the Court. MacQuesten now moves pursuant to Rules 50(b) and 59(a)(1) of the Federal Rules of Civil Procedure for an order setting aside the jury verdict on damages and granting a new trial, or, in the alternative, for a remittitur of the verdict on damages. HCE, in turn, moves to amend and enforce its mechanic's lien. Finally, Palmer Court and AMIC cross-move for summary judgment vacating the lien.

*Background*

In August 1998, Palmer Court entered into a contract with MacQuesten, providing that MacQuesten would serve as general contractor for construction of affordable housing on property owned by Palmer Court at 3300 Palmer Avenue in the Bronx. (Tr. 28–29; Pl. Exh. 1).[1] Immediately thereafter, MacQuesten executed two subcontracts with HCE. One subcontract provided that HCE would be paid $544,150 for foundation work, including construction of concrete footings, walls, and slab-on-grade (the "foundation contract"). (Def.Exh. 2). The contract sum for the foundation work was later increased to $705,300 based on additional work requested by MacQuesten. (Tr. 622–23, 742, 751). The second subcontract provided that HCE would be paid $2,198,000 to install the planks, Vestcom Structural Floor System, and concrete columns and beams for the project (the "plank contract"). (Pl. Exh. 3). In February 1999, HCE began performing masonry work under a third contract that was never signed. (Tr. 701–03; Pl. Exh. 4).

Each month, HCE submitted invoices to MacQuesten for the work completed. (Tr.

628). Before these invoices were considered final, HCE's president, John Hildreth, met with Alan Goncharoff, MacQuesten's project manager, to negotiate any discrepancies. (Tr. 629, 739–40). Once the invoices were agreed to by Mr. Goncharoff, they were formally presented to MacQuesten. (Tr. 629). However, before MacQuensten made payment, it required HCE to execute a subcontractor payment form that included a partial waiver of lien and represented that the subcontractor had been paid in full for work done to date. (Tr. 630, 740–41; Pl. Exh. 8A). Nevertheless, according to HCE, Mr. Goncharoff persuaded HCE to sign the subcontractor payment forms for less than the invoiced amount on the basis that MacQuesten could not afford to pay any more at the time. (Tr. 760–61). Mr. Goncharoff reportedly agreed that MacQuesten would ultimately pay the full amount reflected in the invoices. (Tr. 760–68, 772–73, 776–77, 780, 817–18).

Over time, the relationship between the parties deteriorated. First, HCE encountered a significant amount of unanticipated rock and unsuitable soil as it began excavating for the foundation. (Tr. 618–19). Removal of the rock and additional excavation delayed the project for about six weeks and increased HCE's costs. (Tr. 619–22). As the work continued, the gap between the amount invoiced by HCE and the total payments made by MacQuesten grew wider. When HCE raised this issue in January 1999, MacQuesten agreed to an immediate payment of $100,000, with another $400,000 to be provided when MacQuesten paid HCE's then outstanding invoice. (Tr. 760–64). Further, MacQuesten represented that all of HCE's invoices would be paid in full when additional funding was received for the project in April. (Tr. 776–79).

By the end of April, MacQuesten had not made the promised $400,000 payment, and HCE was experiencing difficulty paying its suppliers. (Tr. 793–95). On May 13, 1999, Mr. Hildreth met with Mr. Goncharoff and Sabino Fogliano, one of MacQuesten's principals. (Tr. 824). By that time, the difference between HCE's invoices and MacQuesten's payments had grown to approximately $1.3 million. (Tr. 831). Mr. Fogliano promised to pay $440,000 by May 21, but that payment was never made. (Tr. 834–35). Accordingly, on June 1, 1999, counsel for HCE sent a letter to MacQuesten advising that it intended to file a lien on the project. (Tr. 840; Def. Exh. 412). Thereafter, according to HCE, MacQuesten refused to allow HCE to return to the site to continue work or to recover its equipment. (Tr. 845–46).

MacQuesten then brought suit, alleging that HCE had abandoned the project, thereby breaching the contracts and causing damage to MacQuesten. HCE counterclaimed and filed third-party claims against Palmer Court and AMIC. Following the completion of discovery, the parties submitted cross-motions for partial summary judgment. The Honorable Victor Marrero, U.S.D.J., who was then presiding over the case, granted HCE's motion and dismissed a claim of fraud asserted by MacQuesten. (Statement of the Court, attached to Order dated March 22, 2002 ("Order") at 4–5). Judge Marrero also granted MacQuesten's motion for summary judgment to the extent of dismissing breach of contract claims against Sabino and Rella Fogliano. (Order at 5–6). However, he denied the balance of MacQuesten's motion with respect to HCE's claims of breach of contract against MacQuesten, lien enforcement, conversion, and interference with economic and business relations. (Order at 6–9).

The case then proceeded to trial. After HCE presented evidence on its counterclaims, MacQuesten failed to move for

judgment as a matter of law under Rule 50. (Tr. 1105–10). The jury returned a verdict rejecting MacQuesten's claims for breach of contract. It also rejected HCE's claims of fraud against MacQuesten, Sabino Fogliano, and Rella Fogliano. However, the jury found for HCE on its remaining counterclaims. Concluding that MacQuesten had breached written and oral contracts and had violated the implied covenant of good faith and fair dealing, the jury awarded HCE $1,042,355.79 on unpaid invoices, $86,000 for equipment that remained on site, and $149,065.72 for extended overhead and profit. Further, the jury found MacQuesten liable for conversion of HCE's machinery and equipment and awarded $86,000 in compensatory damages and $27,500 in punitive damages. Finally, it found that MacQuesten had been unjustly enriched and awarded $416,942.32 on that counterclaim. (Jury Verdict Form, attached as Exhibit 1 to Certification of Peter S. Herman dated July 2, 2003 ("Herman Cert.")).

Thereafter, the parties filed the instant motions. I will provide additional factual details in the discussion of each issue.

*Discussion*

A. *Motion for Judgment as a Matter of Law or New Trial*

1. *Legal Standards*

■ Judgment as a matter of law may be granted under Rule 50 only if "(1) there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or (2) there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded persons could not arrive at a verdict against it." *Galdieri–Ambrosini v. National Realty & Development Corp.*, 136 F.3d 276, 289 (2d Cir. 1998) (citations and brackets omitted). The court must view the evidence in the light most favorable to the party opposing the motion and must defer to all of the jury's credibility determinations and reasonable inferences. *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000); *Raniola v. Bratton*, 243 F.3d 610, 616 (2d Cir.2001); *Caruolo v. John Crane, Inc.*, 226 F.3d 46, 51 (2d Cir.2000); *Galdieri–Ambrosini*, 136 F.3d at 289. On a Rule 50 motion, the court "may not itself weigh the credibility of witnesses or consider the weight of the evidence." *Meloff v. New York Life Insurance Co.*, 240 F.3d 138, 145 (2d Cir.2001) (quoting *Galdieri–Ambrosini*, 136 F.3d at 289). Indeed, "although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves*, 530 U.S. at 151, 120 S.Ct. 2097 (citation omitted).

■ In this case, MacQuesten also has a procedural hurdle to overcome. When a party fails to move for judgment as a matter of law at the close of the evidence, it is precluded from doing so after a verdict is rendered unless it can show manifest injustice. *See Medforms, Inc. v. Healthcare Management Solutions, Inc.*, 290 F.3d 98, 109 (2d Cir.2002); *Cruz v. Local Union No. 3 of the International Brotherhood of Electrical Workers*, 34 F.3d 1148, 1155 (2d Cir.1994); *Gibeau v. Nellis*, 18 F.3d 107, 109 (2d Cir.1994). This is the case even where the moving party is challenging the basis for a damage award, the magnitude of which could not have been known until the verdict was announced. *See Cruz*, 34 F.3d at 1155.

■ The standard for granting a new trial under Rule 59 is less stringent. "[U]nlike a motion for judgment as a matter of law, a trial judge considering a motion for a new trial is free to weigh the evidence himself and need not view it in

the light most favorable to the verdict winner." *United States v. Landau,* 155 F.3d 93, 104 (2d Cir.1998) (internal quotations and citation omitted). Accordingly, " 'a motion for a new trial may be granted even if there is substantial evidence to support the jury's verdict.' " *Caruolo,* 226 F.3d at 54 (quoting *Landau,* 155 F.3d at 104). A new trial is warranted if the court "is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice." *Caruolo,* 226 F.3d at 54 (citation omitted).

### 2. Unpaid Invoices

█] MacQuesten first challenges the jury's award of damages on HCE's unpaid invoice on the grounds that HCE released MacQuesten for any claim beyond those amounts identified in the subcontractor payment forms and that the jury should have been charged that submission of a subcontractor payment form was a condition precedent to any payment. (Memorandum of Law of Plaintiff MacQuesten General Contractors [sic], Inc. in Support of Motion for a New Trial on Damages or, Alternatively for a Remittitur ("MacQuesten Memo") at 18–27). These arguments are procedurally barred from serving as the basis for judgment as a matter of law by MacQuesten's failure to make a Rule 50 motion at trial and, in any event, are without merit.

The first contention is essentially an effort to reargue the summary judgment motion. In rejecting, among other things, MacQuesten's motion for judgment on HCE's breach of contract claims, Judge Marrero noted that "there remain contested issues of material fact about which the parties have widely divergent views." (Order at 1). As an illustration of the disputed facts, he pointed specifically to disagreements over how the parties intended to treat HCE's invoices and the subcontractor payment forms. (Order at 1–2). And, while Judge Marrero acknowledged that HCE signed the partial waivers of lien contained in the payment forms, he held that "[t]hat is not to say, however, that the partial waivers are completely free of ambiguity." (Order at 6–7). He concluded that "a factual issue arises as to whether the parties did in fact implement a system of partial payment for work performed and as to the nature and function of the partial waivers." (Order at 7). The jury decided this issue in favor of HCE, and it is hardly a miscarriage of justice to preclude MacQuesten from rearguing it now, after MacQuesten failed to show its entitlement to judgment as a matter of law on the summary judgment motion and failed to move under Rule 50 at trial.

█] Nevertheless, MacQuesten argues that the subcontractor payment forms are unambiguous and that Judge Marrero was simply reserving judgment on the issue of their enforceability. It relies on the following excerpt from Judge Marrero's decision:

> The Court's discussion should not be mistaken for the proposition that the partial waivers are null and void. HCE clearly executed some sort of release. But the Court cannot resolve the factual disputes surrounding the interpretation of the partial waivers without giving HCE an opportunity to prove its case in light of the arguments raised.

(Order at 7). MacQuesten misreads the summary judgment decision in several respects. First, there is no suggestion that Judge Marrero was "reserving" any issue of law. Second, if the subcontractor payment forms unambiguously waived HCE's right to further payment, then summary judgment would have been granted. Third, Judge Marrero's observation that HCE "executed some sort of release" is entirely consistent with the jury's ultimate verdict: HCE waived any lien for amounts

actually paid by MacQuesten, but not for those amounts invoiced but not yet paid.

MacQuesten fares no better with its argument that the jury should have been instructed that submission of a subcontractor payment form was a condition precedent to any payment to HCE. MacQuesten never submitted a requested charge to that effect. (Declaration of Joseph P. Paranac, Jr. dated Aug. 20, 2003 ("Paranac Decl."), Exh. A). Nor did it raise the issue at the charging conference. (Tr. 1112–37). Nor did it object to the charge as given prior to submission of the case to the jury or, indeed, at any time before the jury was discharged. (Tr. 1223–35).

Rule 51 of the Federal Rules of Civil Procedure provides that "[n]o party may assign as error the giving or the failure to give an instruction unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter objected to and the grounds of the objection." Accordingly, "[w]here . . . the party fails to object to the instruction before the jury begins deliberations, a subsequent challenge based on that charge should be entertained only if the alleged errors are 'fundamental.'" *Shade v. Housing Authority of the City of New Haven*, 251 F.3d 307, 312 (2d Cir.2001) (citing *Frederic P. Wiedersum Associates v. National Homes Construction Corp.*, 540 F.2d 62, 66 (2d Cir.1976)). To qualify as "fundamental," an error must be "'so serious and flagrant that it goes to the very integrity of the trial.'" *Shade*, 251 F.3d at 313 (quoting *Modave v. Long Island Jewish Medical Center*, 501 F.2d 1065, 1072 (2d Cir.1974)). Indeed, the error must be more egregious that the "plain" error that would justify excusing a procedural default in a criminal case. *See Shade*, 251 F.3d at 313; *Travelers Indemnity Co. v. Scor Reinsurance Co.*, 62 F.3d 74, 79 (2d Cir.1995).

MacQuesten has failed to meet this standard. As the cases cited by MacQuesten indicate, even if submission of the subcontractor payment form were considered a condition precedent, such prerequisites are waivable. *See Marshall, Inc. v. Turner Const. Co.*, 139 N.Y.S.2d 55, 57 (1955); *Smith v. Walter*, 172 N.Y.S. 97, 97 (1918); *see also Kinsman v. Royal Indemnity Co.*, 254 A.D.2d 746, 746, 678 N.Y.S.2d 543, 543 (4th Dep't 1998); *Broder v. MacNeil*, 232 A.D.2d 163, 166, 647 N.Y.S.2d 743, 746 (1st Dep't 1996). Here, the jury was properly instructed on waiver (Tr. 1208–10), and was entitled to find that MacQuesten's right to demand execution of the subcontractor payment form—whether or not characterized as a condition precedent— had been waived. In any event, the failure to properly identify an obligation as a condition precedent in charging the jury is not an error so fundamental that it excuses the failure to object. *See Galloping, Inc. v. QVC, Inc.*, 27 F.Supp.2d 466, 467 (S.D.N.Y. 1998).

There is no basis, then, for overturning the jury's verdict with respect to its award on the unpaid invoices.

### 3. Delay Damages

■ MacQuesten next argues that the jury's award of $149,065.72 in delay damages, characterized as "extended overhead/profit," was improper because: (1) it contravenes a no-damages-for-delay clause contained in the subcontracts, (2) HCE failed to note any claim for such damages on its subcontractor payment forms, and (3) HCE relied at trial on an impermissible formula for calculating these damages. While the first two of these arguments lack merit, the third is persuasive.

First, as Judge Marrero noted in denying MacQuesten's summary judgment motion, the no-damages-for-delay clause here appears to be limited to "sequencing de-

lays and delays at the hands of the General Contractor, that is, MacQuesten." (Order at 8–9). Furthermore,

> even exculpatory language which purports to preclude damages for *all* delays resulting from *any* cause whatsoever are not read literally. Generally, even with such a clause, damages may be recovered for: (1) delays caused by the contractee's bad faith or its willful, malicious, or grossly negligent conduct, (2) uncontemplated delays, (3) delays so unreasonable that they constitute an intentional abandonment of the contract by the contractee, and (4) delays resulting from the contractee's breach of a fundamental obligation of the contract.

*Corinno Civetta Construction Corp. v. City of New York,* 67 N.Y.2d 297, 309, 502 N.Y.S.2d 681, 686, 493 N.E.2d 905 (1986) (citations omitted); *see also Petrocelli Electric Co. v. Crow Construction Co.,* No. 93 Civ. 8387, 1999 WL 791683, at *5 (S.D.N.Y. Oct. 5, 1999); *Honeywell, Inc. v. J.P. Maguire Co.,* No. 93 Civ. 5253, 1999 WL 102762, at *21 (S.D.N.Y. Feb. 24, 1999). At trial, HCE presented evidence that would have brought it within at least two of these exceptions. Much of the delay in proceeding with this project was attributable to the discovery of unanticipated rock that impeded the foundation work. (Tr. 726–30). Furthermore, MacQuesten was tardy in producing revised architectural and shop drawing which, in turn, inhibited HCE from performing its work. (Tr. 930–31). Accordingly, the subcontracts do not bar the delay damages that were awarded here.

The argument that delay damages could not be recovered unless they were itemized in the subcontractor payment forms is similarly without merit. MacQuesten's contention assumes that the release contained in those forms is enforceable. But, as discussed above, there was ample basis on which the jury could have found that limitations of payment to the amounts set forth in those forms had been waived. Thus, MacQuesten's reliance on *Kay–R Electric Corp. v. Stone & Webster Construction Co.,* 23 F.3d 55, 57–58 (2d Cir. 1994), is unavailing. There, the releases contained in the payment requisition forms were enforceable; here, the jury determined that they were not.

The proof presented by HCE in support of its claim for delay damages, however, was legally insufficient. The party alleging harm has the burden of proving damages, including delay damages. *Berley Industries, Inc. v. City of New York,* 45 N.Y.2d 683, 686–87, 412 N.Y.S.2d 589, 591, 385 N.E.2d 281 (1978). Even when the quantum of damage is "unavoidably uncertain, beset by complexity or difficult to ascertain," "there must be a definite and logical connection between what is proved and the damages a jury is asked to find." *Id.* at 687, 412 N.Y.S.2d at 591, 385 N.E.2d 281 (citations omitted). Thus, in *Berley,* the New York Court of Appeals rejected delay damages based on an arithmetic formula that simply took the amount of overhead projected in the contract, transformed that amount into a per diem figure based on the length of the contract, and multiplied by the number of days the contractor's work was delayed. *Id.* at 686, 412 N.Y.S.2d at 590 n. 2, 385 N.E.2d 281.

■ Here, HCE did essentially the same thing. Mr. Hildreth testified that total overhead and profit for all three subcontracts was $704,083.00. (Tr. 947–48). Since the project was bid as a five-month job, he divided this number by five to get the monthly overhead and profit figure of $140,816.60. (Tr. 948–49). Since the project was delayed at lest two months, he multiplied the monthly figure by two to get an estimated delay damages figure of $281,633.20 (Tr. 949). Although, as noted above, MacQuesten's attorneys did not make a motion for judgment as a matter of

law on this or any other issue, they did make a timely objection to Mr. Hildreth's testimony. (Tr. 943–46, 949).

HCE's evidence has the same flaws as that presented in *Berley* and subsequent cases. First, it is based only on the inherently unreliable price elements of a bid. *See Novak & Co. v. Facilities Development Corp.*, 116 A.D.2d 891, 892, 498 N.Y.S.2d 492, 494 (3d Dep't 1986). Second, there was no showing that the delays actually caused any increase in any specific item of overhead. *See Berley*, 45 N.Y.2d at 687, 412 N.Y.S.2d at 591, 385 N.E.2d 281. Third, HCE did not claim that such evidence was unavailable. *See id.*, 412 N.Y.S.2d at 591, 385 N.E.2d 281.

Accordingly, MacQuesten is entitled to a new trial on this element of damages, at which time HCE shall be entitled to submit any proof that it has to support its claim. *See Novak & Co.*, 116 A.D.2d at 892, 498 N.Y.S.2d at 494 (retrial rather than dismissal of claim appropriate).

### 4. *Conversion of Equipment*

█ The jury awarded $86,000 each for "equipment on site" and for conversion. Both categories relate to HCE's claim that it was deprived of certain construction machinery when MacQuesten locked it out of the project site. (Tr. 845–49). In rather conclusory fashion, MacQuesten challenges the evidentiary basis for the awards, arguing that they are based on hearsay and unsupported by documentation. Yet, MacQuesten's counsel neither objected to the testimony concerning these claims nor challenged the sufficiency of the evidence at trial. To the extent that MacQuesten argues that HCE never proved that it demanded the return of the equipment, no such demand was necessary in the context of this case since MacQuesten has never asserted a colorable right to continued possession of the machinery. "[I]f demand would be futile because the circumstances

show that the defendant knows it has no right to the goods, demand is not required." *State v. Seventh Regiment Fund, Inc.*, 98 N.Y.2d 249, 260, 746 N.Y.S.2d 637, 645, 774 N.E.2d 702 (2002). And, to the extent that MacQuesten challenges Mr. Hildreth's valuation of the equipment, it is not inherently incredible that the principal of a construction business could give a reasonable valuation of the company's machinery.

However, the awards for equipment on site and for conversion are duplicative of each other. At the charging conference, counsel for HCE made clear that the conversion claim related exclusively to the equipment. (Tr. 1115–16). This representation was reflected in the jury charge. (Tr. 1219). Accordingly, in order to avoid an obvious injustice, the jury's verdict must be reduced to reflect only a single award for the conversion of the equipment.

### 5. *Punitive Damages*

█ In connection with the conversion claim, the jury awarded $27,000 in punitive damages. MacQuesten challenges this verdict on the grounds that there was no showing that its wrongful conduct was aimed at the public generally and that there was insufficient evidence of malice or reckless disregard of HCE's rights.

Some New York caselaw does suggest that where a conversion claim arises out of a breach of contract, punitive damages may only be awarded if the culpable party's conduct was directed at the public. *See, e.g., TVT Records v. Island Def Jam Music Group*, 262 F.Supp.2d 188, 193–96 (S.D.N.Y.2003) (collecting cases); *New York University v. Continental Insurance Co.*, 87 N.Y.2d 308, 316, 639 N.Y.S.2d 283, 287, 662 N.E.2d 763 (1995). However, this requirement applies only where there is a close nexus between the allowed tortious conduct and the contract from which it is

said to arise, for example, where the contract was fraudulently induced or "where a party engages in conduct outside the contract but intended to defeat the contract." *New York University*, 87 N.Y.2d at 316, 639 N.Y.S.2d at 287–88, 662 N.E.2d 763. Here, by contrast, the conversion of HCE's equipment was independent of the terms of the contract—it was separate tortious conduct—and so the requirement of public harm as a prerequisite for punitive damages was not triggered.[2]

MacQuesten also argues that there was insufficient evidence of malice to warrant punitive damages. But New York law permits an exemplary award against a party that engages in self-help by violating the rights of its adversary rather than relying exclusively on its legal remedies. *See Hudson Motors Partnership v. Crest Leasing Enterprises, Inc.*, 845 F.Supp. 969, 975–76 (E.D.N.Y.1994); *Suffolk Sports Center, Inc. v. Belli Construction Corp.*, 212 A.D.2d 241, 247, 628 N.Y.S.2d 952, 955–56 (2d Dep't 1995) ("to countenance or otherwise allow [defendant's] actions to go unpunished would imply that any [party] who decides to terminate a valid . . . contract may resort to self-help in order to accomplish its purpose"). Here, MacQuesten had no arguable basis for retaining HCE's equipment, and the jury was entitled to infer that it did so merely to give itself leverage in the contract dispute between the parties. That is an adequate basis for awarding punitive damages.

### 6. Unjust Enrichment

 At the charging conference, HCE's counsel distinguished their claim for unjust enrichment from their contract claims on the ground that the unjust enrichment claim was simply a different legal theory for challenging MacQuesten's con-

version of HCE's equipment. (Tr. 1115–16). Nevertheless, the jury awarded HCE $416,942.32, a figure unrelated to the conversion or, indeed, to any other theory presented in the case. As there is no legal or evidentiary basis for the jury's verdict, MacQuesten is entitled to a new trial on this claim.

### 7. Remittitur

 The mechanism of a conditional order of remittitur compels a prevailing party to choose between accepting reduction of an excessive verdict and undergoing a new trial. *See Kirsch v. Fleet Street, Ltd.*, 148 F.3d 149, 165 (2d Cir.1998). It is appropriate

"in at least two distinct types of cases: (1) where the court can identify an error that caused the jury to include in the verdict a quantifiable amount that should be stricken, . . . and (2) more generally, where the award is 'intrinsically excessive,' in the sense of being greater than the amount a reasonable jury could have awarded, although the surplus cannot be ascribed to a particular, quantifiable error."

*Id.* (quoting *Trademark Research Corp. v. Maxwell Online, Inc.*, 995 F.2d 326, 337 (2d Cir.1993) (quoting *Shu–Tao Lin v. McDonnell Douglas Corp.*, 742 F.2d 45, 49 (2d Cir.1984))). In this case, all of MacQuesten's challenges to the verdict fell into the first group: they were categorical attacks on the entire damage award for certain claims. Therefore, to the extent that MacQuesten's arguments have prevailed, HCE will be accorded the choice of accepting a reduced verdict that omits the flawed awards or proceeding with a new trial. As discussed above, the awards that are not supportable are those for delay damages,

---

**2.** Of course, but for the contract, HCE's equipment would not have been on the work site. But no case holds that such a tenuous relationship is enough to create a heightened standard for punitive damages.

conversion, (as duplicative of "equipment on site"), and unjust enrichment. Accordingly, HCE may elect between a new trial or a judgment consisting of the principal amounts of $1,042,355.79 for unpaid invoices, $86,000 for conversion of the equipment on site, and $27,000 in punitive damages, for a total of $1,155,355.79.

## B. *Enforcement of the Lien*

On June 7, 1999, HCE filed a Notice of Mechanic's Lien for the sum of $1,783,304.99 with the Bronx County Clerk on the basis that MacQuesten had failed to pay for labor and materials provided by HCE under its subcontracts. (Affidavit of Joseph J. Paranac dated July 2, 2003 ("Paranac Lien Aff."), Exh. D (the "Notice of Lien") ¶ 6). This notice was served on both MacQuesten and Palmer Court. On July 1, 1999, MacQuesten obtained an order in New York State Supreme Court, Bronx County, authorizing the posting of a bond in the amount of $2 million in order to discharge the lien. (Paranac Lien Aff., Exh. E). On July 7, 1999, MacQuesten, as principal, and AMIC, as surety, filed the required bond. (Paranac Lien Aff., Exh. F).

In its Amended Answer, Counterclaim, and First Amended Third Party Complaint in this action, HCE asserted a claim against MacQuesten, Palmer Court, and AMIC seeking to foreclose on the lien and collect against the bond. (Amended Ans. ¶¶ 61–67). At trial, the parties agreed that it was appropriate to reserve this claim for determination by the Court following the jury's verdict on all other issues. (Tr. 1112–13).

Now, Palmer Court and AMIC oppose HCE's application and cross-move to vacate the lien on several grounds. First, they contend that as a foreign corporation not qualified to do business in New York, HCE is barred from affirmatively asserting its lien claim. Next, these third-party defendants maintain that the lien was invalid because it misdescribed the subject property. Third, they reiterate the argument, made by MacQuesten in its motion for judgment as a matter of law or new trial, that HCE waived its claims to enforce any lien by executing the subcontractor payment forms. Finally, the third-party defendants contend that, at most, only the jury's award for unpaid invoices would be chargeable against the lien since the remaining items of damages do not relate to improvements made to the property. In addition to responding to these arguments, HCE has moved for an order permitting it to file an amended mechanic's lien *nunc pro tunc*, correcting the description of the property.

### 1. *New York's Door Closing Statute*

 Pursuant to New York's Business Corporations Law ("BCL"), a foreign corporation must be authorized to do business in the state in order to be entitled to initiate an action in the state courts.

> A foreign corporation doing business in this state without authority shall not maintain any action or special proceeding in this state unless and until such corporation has been authorized to do business in this state and it has paid to the state all fees and taxes imposed under the tax law or any related statute, as defined in section eighteen hundred of such law, as well as penalties and interest charges related thereto, accrued against the corporation. This prohibition shall apply to any successor in interest of such foreign corporation.

BCL § 1312(a). This provision also precludes a proceeding in the federal courts if, as in this case, jurisdiction is based exclusively on diversity of citizenship. *See Netherlands Shipmortgage Corp. v. Madias,* 717 F.2d 731, 735 (2d Cir.1983); *G.V. Trademark Investments, Ltd. v. Gemini Shirtmakers, Inc.,* No. 97 Civ. 5835, 1999

WL 961777, at *2 (S.D.N.Y. Oct. 21, 1999). However,

> [T]he failure of a foreign corporation to obtain authority to do business in this state shall not impair the validity of any contract or act of the foreign corporation or the right of any other party to the contract to maintain any action or special proceeding thereon, and shall not prevent the foreign corporation from defending any action or special proceeding in this state.

BCL § 1312(b).

It is well-established that the provision allowing foreign corporations doing business in New York without authorization to defend themselves in court includes the right to assert counterclaims. *See James Howden & Co. v. American Condenser & Engineering Corp.*, 194 A.D. 164, 167–68, 185 N.Y.S. 159, 161–62 (1st Dep't 1920) (decided under predecessor to BCL § 1312); *J.R. Alsing Co. v. New England Quartz & Spar Co.*, 66 A.D. 473, 73 N.Y.S. 347, 350 (1st Dep't 1901) (same). Moreover, building upon these cases, courts in New York have determined that once haled into court as a defendant, such a corporation may also assert third-party claims. *See Williams Erectors of Suffolk County v. Mulach Steel Corp.*, 684 F.Supp. 357, 358 (E.D.N.Y.1988); *Reese v. Harper Surface Finishing Systems*, 129 A.D.2d 159, 162–65, 517 N.Y.S.2d 522, 523–26 (2d Dep't 1987).

Nevertheless, Palmer court and AMIC argue that a foreign corporation not qualified to do business here may assert third-party claims only insofar as they are claims for indemnity and contribution. However, there is no basis in the caselaw for such a distinction. First, the cases themselves do not differentiate among different types of third-party claims. While the claim in *Reese* was one for indemnification or contribution, this fact did not enter into the court's reasoning. 129 A.D.2d at

161–65, 517 N.Y.S.2d at 524–26. And, in *Williams Erectors*, there is no indication of the nature of the third-party claim.

Second, the rationale of the courts applies to all types of third-party claims. They reason that the filing of a counterclaim or third-party action is within the meaning of "defending any action." As the court said in *Reese*, "'[t]he defendant, having been brought into court and thus made to defend, should be allowed, unless there is a distinct provision to the contrary, not only to defend but also to litigate any question arising out of the transaction that has been made the basis of the plaintiff's complaint.'" 129 A.D.2d at 163, 517 N.Y.S.2d at 525 (quoting *J.R. Alsing Co.*, 66 A.D. at 476, 73 N.Y.S. at 347); *see also Williams Erectors*, 684 F.Supp. at 358. Just as there is no "distinct provision" precluding counterclaims or third-party claims generally, there is none prohibiting specific categories of third-party claims. The courts also reason that judicial efficiency is served by the adjudication of all related claims in a single proceeding. *See Williams Erectors*, 684 F.Supp. at 358, *Reese*, 129 A.D.2d at 164–65, 517 N.Y.S.2d at 525–26. This rationale, too, would apply to a third-party claim to enforce a lien just as it would apply to claims for indemnification or contribution.

To be sure, the legislature might have crafted a scheme that limited the foreign corporation to those devices that would offset or transfer its own liability: counterclaims only up to the amount for which the defendant is liable and only those third-party claims that seek indemnification or contribution. But such an argument is foreclosed by decisions holding that the foreign corporation's right to assert a counterclaim is not so limited; it may exceed the amount sought in the plaintiff's complaint. *See Reese*, 129 A.D.2d at 163, 517 N.Y.S.2d at 525; *James Howden &*

*Co.*, 194 A.D. at 167–68, 185 N.Y.S. at 161–62. By the same reasoning, a thirdparty claim is not limited to indemnification or contribution. Section 1312 of the BCL is therefore no bar to HCE's claim for enforcement of its lien.

### 2. *Validity of the Lien*

On September 17, 1998, the property on which the Palmer Court project was to be built was assigned lot numbers 12 and 41 in Block 5228 by the New York City Surveyor's Office. (Certification of Michael DePasquale dated Aug. 14, 2003) ("DePasquale Cert."), ¶ 3 & Exh. 1. These designations are reflected in the tax map dated May 11, 1999, on file with the New York City Department of Finance. (DePsquale Cert., ¶ 4 & Exh. 2). Although there is only a single pedestrian street entrance to the property, it was assigned a range of street addresses: 3300–3322 Palmer Avenue. (DePasquale Cert., ¶ 6 & Exh. 3). The Notice of Lien filed by HCE alleged a debt to HCE of $1,783,304.99, and identified the property where the work had been performed as "Zone: R4, Map: 2b, Section: 12–10, Block: 5228, Lot: 41. 3310 Palmer Ave." (Notice of Lien, ¶¶ 6, 8).

Palmer Court and AMIC argue that because the Notice of Lien misdescribed the property, the lien is invalid and neither the lien nor the bond is subject to foreclosure. HCE responds that it substantially complied with the terms of New York's lien law, and that it should be permitted to amend the Notice of Lien retroactively.

Pursuant to New York law, a notice of lien must state, among other things, "[t]he property subject to the lien, with a description thereof sufficient for identification; and if in a city or village, its location by street and number, if known." N.Y. Lien Law § 9(7). The law further provides that "[t]his article is to be construed liberally to secure the beneficial interests and purposes thereof. A substantial compliance with its several provisions shall be sufficient for the validity of a lien and to give jurisdiction to the courts to enforce the same." N.Y. Lien Law § 23. Finally, a lienor may amend its notice of lien as of right within sixty days of the original filing, N.Y. Lien Law § 12–a(1), and at any time thereafter by obtaining a court order:

> In a proper case, the court may, upon five days' notice to existing lienors, mortgagees, and owner, make an order amending a notice of lien upon a public or private improvement, nunc pro tunc. However, no amendment shall be granted to the prejudice of an existing lienor, mortgagee or purchaser in good faith, as the case may be.

N.Y. Lien Law § 12–a(2).

In this case, neither the underinclusiveness of the street address as identified in the Notice of Lien nor the inadvertent omission of one of the two relevant lot numbers is so material that HCE's right to amend its lien should be denied. As MacQuesten's architect of record has stated, the project was a single, integrated building extending over two lots:

> The building was constructed as a single building, situated on both lots, with a common foundation, floors, walls and roof. There is one main electrical service from the street, one main plumbing line, and a central heating system.

(DePasquale Cert., ¶ 5). Therefore, there was nothing ambiguous about HCE's identification of the property as "3310 Palmer Avenue," an address that is certainly within the improved property and is presumably the designation for the single pedestrian entrance. Likewise, since the building extends over both lots 12 and 41, and HCE performed work on the entire structure, the omission of lot 12 from the Notice of Lien did not render it invalid or preclude amendment. Finally, no other lienor or

mortgage has alleged prejudice, and it is difficult to imagine how such prejudice would arise. As long as those creditors, like HCE, had asserted a security interest in the entire property, that interest would be unaffected by the proposed amendment. Indeed, even AMIC, which guaranteed the bond to discharge HCE's lien, has not alleged that it believed the lien to apply to only a portion of the property. This is not a situation where prejudice might arise, for example, from an amendment that would increase the lien amount or one that would impose a lien on property separate and apart from that originally designated.

Nevertheless, Palmer Court and AMIC argue that no court has permitted an amendment that would increase the property subject to lien. That is incorrect. In *Fremar Building Corp. v. Sand,* 104 A.D.2d 1025, 480 N.Y.S.2d 945 (2d Dep't 1984), for example, the original notice of lien identified the property by a lot number which, in fact, was an unimproved parcel adjacent to the two lots where the construction work was actually performed. *Id.* at 1026, 480 N.Y.S.2d at 946. Nevertheless, the original lien was "at least partially correct" in that it accurately identified the street address. *Id.* at 1026–27, 480 N.Y.S.2d 945. Despite the fact that correcting the lot designation would enlarge the property subject to the lien, the court held that "while the incorporation in the notice of the incorrect lot number might indeed have rendered the notice imperfect, the same would not appear to preclude an amendment in the absence of prejudice." *Id.* at 1027, 480 N.Y.S.2d at 947 (citations omitted).

Similarly, in *Dovin Construction Co. v. 7MDR of Queens, Inc.,* 149 Misc.2d 822, 566 N.Y.S.2d 994 (1991), the court permitted an amendment to correct the misdesignation of the block where the property was situated. It held that the requirement of identifying the block number was intended to facilitate filing of the lien by the clerk

and was unnecessary for substantial compliance with the Lien Law:

> Lien Law § 9(7) requires that the notice of lien give a "description ... sufficient for identification; and if in a city ... its location by street and number, if known." There is nothing in this section which requires a further description such as a metes and bounds description or a block and lot number description. All that is required under this section is a description that identifies the property and that is in substantial compliance with the provisions of the statute sufficient to provide jurisdiction to the courts to enforce it.

*Id.* at 825, 566 N.Y.S.2d at 996 (citation omitted). This reasoning applies with even greater force where, as here, the block number was correct, and only the identification of lot numbers was underinclusive.

In *Marshall Construction Co. v. Brookdale Hospital Center,* 68 Misc.2d 20, 324 N.Y.S.2d 806 (1971), yet another court permitted an amendment that effectively expanded the property subject to lien. There, the lienor had correctly identified the block and lot number but had misdescribed the metes and bounds of the property on which it had performed work. Nevertheless, the court allowed the amendment:

> [T]his is not a case where the correct property and the misdescribed property are entirely separate, distinct and lying apart from each other. In the instant case, the correct property and the misdescribed property are within the same hospital complex in or about Brookdale Plaza, and are contained within the same block number, which petitioner correctly set forth. They are also in the same Lot # 1 and adjacent to each other.

*Id.* at 22, 324 N.Y.S.2d at 808–09. In the present case, the correct property and the

misdescribed property are also not "separate, distinct and lying apart from one another." Nor are they merely adjacent. Rather, the misdescribed property is half of the correct property, which is a single, integrated project. The caselaw, then, fully ·supports granting HCE's motion to amend.

The decisions cited by Palmer Court and AMIC do not dictate a contrary result. Generally, they fall into three categories, each of which is distinguishable from the circumstances of the instant case. First, some of them concern notices of liens filed against condominium units where a liberal reading of the Lien Law would bring it into conflict with provisions of the Real Property Law specific to condominiums. *See Northeast Restoration Corp. v. K & J Construction Co.*, 304 A.D.2d 306, 757 N.Y.S.2d 542 (1st Dep't 2003); *Diamond Architecturals, Inc. v. EFCO Corp.*, 179 A.D.2d 420 578 N.Y.S.2d 553 (1st Dep't 1992); *Advanced Alarm Technology, Inc. v. Pavilion Associates*, 145 A.D.2d 582, 536 N.Y.S.2d 127 (2d Dep't 1988). Second, other cases found notices of lien to be insufficient where they completely misdescribed the property. *See Sprickerhoff v. Gordon*, 120 A.D. 748, 750, 105 N.Y.S. 586, 587 (1st Dep't 1907) (notice provided no street number and described lot 25 feet wide although building stood on 50 foot lot); *Blackman–Shapiro Co. v. Salzberg*, 8 Misc.2d 972, 974–75, 168 N.Y.S.2d 590, 593 (1957) ("complete absence of any description of the property upon which the work was allegedly performed"). Finally, in *Levie v. Cottage Homes, Inc.*, 124 N.Y.S.2d 118, 119–20 (1953), the court declined to permit foreclosure on a lien that included property on which the lienor had done no work. These case, then, are inapposite, and HCE is entitled to amend its Notice of Lien *nunc pro tunc* and to enforce that lien on the basis of the judgment ·in this case.

### 3. *Waiver of Liens*

Palmer Court and AMIC contend, in effect, that they are third-party beneficiaries of the waiver of lien provisions contained in the subcontractor payment forms. However, as discussed above, the jury was entitled to find that MacQuesten did not intend those forms to abrogate HCE's entitlement to payment or its right to assert a lien beyond those amounts that it actually paid to HCE. Accordingly, the claims of Palmer Court and AMIC as third-party beneficiaries are similarly limited.

### 4. *Amount of the Lien*

Palmer Court and AMIC correctly argue that the lien may be enforced only to the extent that HCE is awarded a judgment relating to labor and materials that were incorporated in improvements to the property. "[R]elief under the Lien Law is predicated upon a showing that labor or materials have been furnished and have been expended or used so as to have become an inseparable part of the object of the particular contract." *P.T. & L. Construction Co. v. Winnick*, 59 A.D.2d 368, 370, 399 N.Y.S.2d 712, 713 (3d Dep't 1977). This is because "liens provide a limited remedy and are generally used to recover the fair value of that which, because of its use, is now physically or logically unrecoverable." *Id.* at 369, 399 N.Y.S.2d at 713.

Pursuant to these principles, HCE's lien is enforceable only to the extent ·of the jury's award for unpaid invoices. The equipment left on the work site was not in itself an improvement to the property. Rather, HCE expected the return of those assets, as evinced by its tort claim for conversion. Accordingly, the lien does not extend to damages on that claim. Likewise, the jury's award for punitive damages related to the conversion of the equipment is beyond the scope of

the lien. *See East Hills Metro, Inc. v. J.M. Dennis Construction Corp.*, 183 Misc.2d 439, 441, 703 N.Y.S.2d 897, 899 (2000) (claim for lost profits may not be included in lien).

*Conclusion*

MacQuesten's motion for judgment as a matter of law or new trial is granted in part and denied in part. The jury's awards for extended overhead and profit and unjust enrichment as well as its duplicative award for conversion are without foundation. Therefore the plaintiff is entitled to a new trial on the counterclaims unless, within two weeks of the date of this Memorandum Opinion and Order, HCE agrees to remittitur pursuant to which a judgment would be entered for $1,042,355.79 for unpaid invoices, $86,000 for conversion of equipment, and $27,500 for punitive damages on the conversion claim, for a total of $1,155,855.79. HCE's motion to amend its Notice of Lien is granted, and the cross-motions of Palmer Court and AMIC to vacate the lien are denied. HCE is entitled to amend its Notice of Lien *nunc pro tunc* to reflect the correct description of the project property, and it is further entitled to enforcement of that lien to the extent of the award for unpaid invoices. If HCE accepts remittitur, it shall submit a proposed judgment on notice.

SO ORDERED.