[628 NYS2d 952]

SUFFOLK SPORTS CENTER, INC., et al, Respondents, v BELLI CONSTRUCTION CORP. et al., Appellants. (Action No. 1.)

ISLAND SPORTS CENTER, INC., Respondent, v BELLI CONSTRUCTION CORP., Appellant, et al., Defendant. (Action No. 2.)

Second Department, June 26, 1995

APPEARANCES OF COUNSEL

*Arthur E. Arnow, P. C.,* Plainview, for appellants.

*Joseph D'Elia,* Huntington *(George W. Clarke* of counsel), for Island Sports Center, Inc., respondent.

### OPINION OF THE COURT

SANTUCCI, J.

The question presented on this appeal is whether punitive damages should be awarded when a landlord intentionally prevents ingress and egress to a sports facility by blocking one entrance to the premises with "two [five-ton] cement blocks next to each other" and the other entrance with "a tremendous big red truck without the cab." Under the facts and circumstances of this case we conclude that such damages may be awarded.

## Factual Background

At trial the following evidence was adduced. In November 1976 the plaintiff Island Sports Center, Inc. (hereinafter Island), leased a two-acre parcel in Huntington, Long Island, from the defendant Belli Construction Corp. (hereinafter Belli), a company owned and operated by the four Belli brothers, who occupied the adjacent acreage, for a period of 10 years with an automatic 10-year renewal at the tenant's

option. The property was operated by Island as a public sports amusement center equipped with a batting range, bumper boat rides, and a miniature golf course. On or about March 24, 1983, Island entered into an agreement with the plaintiff Suffolk Sports Center (hereinafter Suffolk), whereby Island sold the business and assigned the lease to Suffolk, a company owned and operated by three individuals. The purchase price for the business was $55,000. Suffolk was to pay $5,000 upon execution of the sales agreement and execute 48 promissory notes totaling $50,000 plus interest. Suffolk also accepted assignment of the lease for the remainder of the lease term, at a rental price of $1,333 per month, after receiving a written assurance from Belli that Island was "current with their rent payments and * * * not in default of any terms or conditions of the lease".

After investing several thousand dollars on some new equipment, effecting repairs and improvements to the premises, developing a "fitness-related baseball clinic" which included personalized instruction by a popular sports figure, and launching an extensive advertising campaign aimed predominantly at local little leagues, Suffolk conducted its grand opening season from March 27, 1983 to October 16, 1983. According to Suffolk, its first season was marked by successful patronage from the leagues, seven days a week, especially during their "prime time" in April, May, and part of June, and the baseball clinic maintained a steady enrollment of about 40 participants. Throughout this first season Belli and Suffolk enjoyed friendly relations, and Belli often assisted Suffolk with the maintenance of the property.

In November 1983 the parties agreed that Suffolk could make the December 1983 and January 1984 rent payments when it paid its rent for February 1984. When Suffolk attempted to tender the December 1983 and the January and February 1984 payments Belli informed Suffolk that there was an offer for the property, that Belli recognized only Island as the tenant, that Island owed Belli back rent, and that Belli wanted "them out of there". Belli denied having made such statements. Nevertheless, despite Suffolk's repeated attempts to pay the rent from December 1983 through April 1984, Belli refused to accept the tendered payments. Belli stated that it did not accept rent throughout this period, because Suffolk had failed to provide proof that it had procured the insurance coverage required under the lease, and because Suffolk did not tender its share of property taxes. However, Belli admitted

that it never even opened the three certified mailings from Suffolk wherein Suffolk had tendered the rent and had indicated its willingness to pay the property taxes upon its being furnished with a photocopy of the tax bill. Moreover, Belli stipulated during trial that at no time did it ever give Suffolk any written notice concerning any rent adjustment, tax apportionment, or Suffolk's failure to provide an insurance certificate.

On March 3, 1984, Suffolk, Belli, and Island met to "get everything straightened out". According to Suffolk, Belli wanted Suffolk to invest $20,000 in the property by May 1, 1984, toward its "upkeep" and "improve[ment]", or Belli was going to break the lease and issue a one-year lease that would be renewable at Belli's discretion. Belli contends that Suffolk had allowed the property to become "rundown" and that the offer of a one-year lease was for Suffolk's benefit in the event that it was unable to maintain the business and property.

On the morning of April 7, 1984, Suffolk was unable to enter its sports facility because the gate to the premises had been chained and locked. Suffolk immediately contacted Belli, who admitted to placing the chain and lock on the gate. Suffolk explained that it had been mailing Belli the rent payments, and emphasized the importance of opening the sports facility for the season. Belli agreed to remove the lock but, according to Suffolk, renewed its intention to interfere with Suffolk's operation unless Suffolk agreed to break the existing lease and execute a new one-year lease. Suffolk then prepared the facility for the 1984 season and opened on April 9, 1984.

According to Suffolk, Belli approached Suffolk on Friday, April 20, 1984, with a printed one-year lease and informed it that if the new lease was not signed by the next day, Belli would block Suffolk from entering the property and would prevent it from operating. Suffolk explained the effort that had been invested in opening the facility for the 1984 season, and Belli agreed to let Suffolk operate without interference on that weekend.

Beginning on the following Monday, April 23, 1984, and continuing through June 8, 1984, Belli intentionally prevented any "ingress and egress" to the sports facility, by blockading one entrance of the premises with "two [five-ton] cement blocks next to each other", and the other entrance with "a tremendous big red truck without the cab". As a result Suffolk

was unable to conduct business. After several attempts, Suffolk finally managed to contact Belli on April 27, 1984, at which time Belli renewed its insistence upon a one-year lease and agreed to lift the barricades if Suffolk or Island agreed to break the lease and sign a one-year lease. During the blockade, Suffolk deposited its rent payments into the Suffolk County District Court, which ultimately directed that the payments be released to Belli and ordered the removal of the blockade on June 1, 1984.

Suffolk reopened the sports facility on June 9, 1984, but was unable to reestablish the customer loyalty and "good will" experienced during the previous season, or recapture its major patronage from the local little league teams due to the fact that the teams "went ahead and made arrangements with [Suffolk's] competitors" during the 37 days of the "blockade". Suffolk closed for the season on September 16, 1984, having yielded gross revenues substantially lower than the previous season, and requiring about $30,000 of additional capital from Suffolk's owners in order to meet the seasonal deficits. Shortly thereafter Suffolk decided to permanently discontinue the sports facility in light of the financial difficulties it experienced and Belli's "history of making good with [its] threats".

In 1986 Belli contracted to sell the property to Canyon Atlantic, another corporation in which the Belli brothers had an interest, for the purpose of constructing an office building complex. However, the complex was never built and in 1988 Belli removed Suffolk's equipment and "cleaned up the site".

In March 1993 Suffolk commenced this action to recover damages from Belli for breach of the covenant of quiet enjoyment, wrongful eviction, loss of business, and for causing Suffolk to default on its loan payments to Island. Island also commenced an action to recover damages from Belli, *inter alia,* for loss of its investment, and against Suffolk for loss of investment and breach of the sale and lease agreement. After trial, the jury found that Belli's intentional act of blockading Suffolk's sports facility from April 23 to June 1, 1984, proximately caused Suffolk's loss of business profits for the 1984 season, the shutdown of Suffolk's business for the remainder of the lease term, Suffolk's loss of investment money, and Suffolk's default on payments to Island. The jury found, however, that the alleged threats made by Belli to Suffolk were not a proximate cause of these damages.

The jury awarded the individual owners of Suffolk $3,660

for the loss of 1984 profits, $45,000 for the loss of their investment, $2,500 for the lease security Belli was still holding, $48,204.45 representing the amount of the remaining notes to Island on which Suffolk had defaulted, plus attorney's fees, and $300,000 in punitive damages. On its counterclaim, Belli was awarded rental payments from Suffolk through September 1986, the end of the first 10-year lease period, and Island was awarded attorney's fees.

Thereafter, Belli moved, pursuant to CPLR 4404, to set aside both the compensatory and punitive damage awards asserting, *inter alia,* that the punitive damage award was "constitutionally unacceptable". The Supreme Court denied Belli's motion as to compensatory damages, but set aside the punitive damage award as excessive and ordered a new trial on that issue, unless all parties stipulated to a reduced punitive damage award of $60,000. The parties declined to so stipulate and this appeal ensued.

## The Law

We begin our discussion by noting that punitive damages are normally not available for mere breach of contract since "their purpose is not to remedy private wrongs, but to vindicate public rights" *(Rocanova v Equitable Life Assur. Socy.,* 83 NY2d 603, 613, citing *Garrity v Lyle Stuart, Inc.,* 40 NY2d 354, 358). However, where the wrong complained of evinces a "high degree of moral turpitude" or is "actuated by evil and reprehensible motives", and demonstrates "such wanton dishonesty as to imply a criminal indifference to civil obligations" punitive damages are recoverable if the conduct was "aimed at the public generally" *(Walker v Sheldon,* 10 NY2d 401, 404-405; *see also, Ciraolo v Miller,* 138 AD2d 443, 444; *Halpin v Prudential Ins. Co.,* 48 NY2d 906). In the case at bar, although the action is predicated upon breach of a landlord-tenant relationship, upon our review of the record we nevertheless conclude that Belli's actions were sufficiently reprehensible so as to warrant the imposition of punitive damages against it.

Belli contends that its conduct towards Suffolk was motivated solely by legitimate business reasons such as Suffolk's nonpayment of rent and its failure to obtain the insurance required by the lease. However, Belli never commenced either a nonpayment or holdover proceeding against Suffolk (or Island Sports) based upon either of these reasons. Belli's

argument is further belied by the fact that after February 1984 it refused to even open Suffolk's certified mailings which contained both the rent and Suffolk's offers to pay its appropriate share of real estate taxes. Moreover, as noted earlier, Belli admitted that at no time did it ever give Suffolk any written notice concerning any rent arrearage, tax apportionment, or Suffolk's failure to provide Belli with an insurance certificate.

Instead, Belli embarked upon a calculated effort to vitiate the landlord-tenant relationship between it and Suffolk, by repeatedly insisting that Suffolk enter into a new lease for one year only, demanding that Suffolk expend additional monies to improve the property, and threatening to interfere with Suffolk's business operation. When it became apparent that Suffolk would not be intimidated, Belli resorted to the more drastic tactic of preventing Suffolk from gaining access to the premises, with the result that Suffolk was essentially forced out of business.

In our view Belli's actions "involve that degree of bad faith evincing a 'disingenuous or dishonest failure to carry out [the parties'] contract' " so as to justify the imposition of punitive damages *(Williamson, Picket, Gross v Hirschfeld,* 92 AD2d 289, 295, quoting *Gordon v Nationwide Mut. Ins. Co.,* 30 NY2d 427, 437, *cert denied* 410 US 931; *see also, Aero Garage Corp. v Hirschfeld,* 185 AD2d 775). Moreover, to countenance or otherwise allow Belli's actions to go unpunished would imply that any landlord who decides to terminate a valid landlord-tenant contract may resort to self-help in order to accomplish its purpose. Clearly landlords and tenants both have various rights and remedies provided to them under the law by which they can affect the terms of their relationship or seek to terminate that relationship. However, neither a tenant nor a landlord is entitled to exercise his own extralegal methodology in order to bring about a desired result. Indeed, if such were the case, the entire body of landlord-tenant law would be rendered inconsequential.

In this regard we note that, although Belli's actions were not specifically directed at the public, nevertheless an award of punitive damages is appropriate since punitive damages are intended "not only to punish the defendant but to deter him, as well as others who might otherwise be so prompted, from indulging in similar conduct in the future" *(Walker v Sheldon,* 10 NY2d 401, 404, *supra).* Moreover, as noted above, to allow any landlord to vitiate a landlord-tenant contract by resort to

extralegal means would generally do a disservice to all tenants. Therefore, to the extent that denying a punitive damage award herein could be interpreted as tacit permission for a landlord to engage in threats and intimidation, conversely, the sanctioning of punitive damages will serve the public good by acting as a deterrent to similar actions in the future. As stated in *Davis v Williams* (92 Misc 2d 1051, 1054) "[t]he public benefit and a display of ethical indignation are among the ends of the policy to grant punitive damages" *(see also, Toomey v Farley,* 2 NY2d 71).

Accordingly, we find that the jury properly awarded punitive damages herein. However, we also agree with the Supreme Court that the amount of damages awarded, to wit $300,000, is "disproportionate to the amount of compensatory damages and to the essential nature of defendant's conduct". Accordingly, the Supreme Court correctly set aside the award for punitive damages and ordered a new trial on this issue unless the parties stipulated to a new award in the amount of $60,000.

Furthermore, we find that since Suffolk was a new business with a nominal fiscal history, the calculation of lost profits was unduly speculative and thus, the jury's award for lost profits is hereby vacated *(see, Kenford Co. v County of Erie,* 67 NY2d 257). Finally, Suffolk was not entitled to an award of attorney's fees absent an agreement between the parties, statutory authorization, or court rule *(see, Hooper Assocs. v AGS Computers,* 74 NY2d 487), none of which are present here.

Accordingly, the order appealed from must be modified by deleting the provisions thereof which denied those branches of the motion of the defendants Belli Construction Corp. and Arthur Belli which were to set aside the jury verdict awarding (1) damages for lost profits, and (2) attorney's fees to the plaintiff Suffolk Sports Center, Inc., and substituting therefor provisions granting those branches of the motion, and the matter is remitted to the Supreme Court, Suffolk County for a new trial on the issue of punitive damages only, unless the plaintiffs stipulate to decrease the verdict as to punitive damages from the sum of $300,000 to $60,000.

MILLER, J. P., O'BRIEN and FLORIO, JJ., concur.

Ordered that the order is modified, on the law, by (1) deleting the provision thereof which denied the branch of the motion of the defendants Belli Construction Corp. and Arthur

Belli which was to set aside the jury verdict awarding damages to the plaintiff Suffolk Sports Center, Inc. for lost profits and substituting therefor a provision granting that branch of the motion, and that portion of the jury's verdict is vacated, and (2) deleting the provision thereof which denied the branch of the motion which was to set aside the jury's verdict awarding attorney's fees to Suffolk Sports Center, Inc., and substituting therefor a provision granting that branch of the motion and that portion of the jury's verdict is vacated; as so modified, the order is affirmed insofar as appealed from, without costs or disbursements, and the matter is remitted to the Supreme Court, Suffolk County, for a new trial on the issue of punitive damages only, unless within 20 days after service upon the plaintiff Suffolk Sports Center, Inc., of a copy of this decision and order, with notice of entry, it shall serve and file in the office of the Clerk of the Supreme Court, Suffolk County, a written stipulation consenting to decrease the verdict as to punitive damages from the sum of $300,000 to $60,000 and for entry of an appropriate judgment accordingly.