**TVT RECORDS, Plaintiff–Counter–Defendant–Appellee,**

TVT Music, Inc., Plaintiff–Appellee,

v.

THE ISLAND DEF JAM MUSIC GROUP, a division of UMG Recordings, Inc., Defendant–Counter–Claimant–Appellant,

Lyor COHEN, Defendant–Appellant,

Steven Gottlieb, Counter–Claimant.

Docket No. 03–9026(L), 03–9046(CON), 03–9122(CON), 03–9258(CON).

United States Court of Appeals, Second Circuit.

Argued: Aug. 10, 2004.

Decided: June 14, 2005.

See also 279 F.Supp.2d 413 and 288 F.Supp.2d 506.

84

Paul G. Gardephe (Kathleen L. Jennings, Shawn V. Morehead, Richard O. Jackson, on the brief), Patterson, Belknap, Webb & Tyler LLP, New York, NY, for Defendant–Counter–Claimant–Appellant.

Andrew L. Frey (Sanford I. Weisburst, on the brief), Mayer, Brown, Rowe & Maw LLP, New York, N.Y. (Matthew S. Dontzin, David A. Fleissig, the Dontzin Law Firm LLP, New York, NY, on the brief), for Defendant–Appellant.

Edward P. Lazarus (William A. Norris, Peter L. Haviland, Michael C. Small, Jonathan Gottlieb, on the brief), Akin Gump Strauss Hauer & Feld LLP, Los Angeles, CA (Lewis J. Liman, Karen A. Newirth, Cleary Gottlieb Steen & Hamilton, New York, NY, on the brief), for Plaintiff–Counter–Defendant–Appellee and Plaintiff–Appellee.

Before: JACOBS, B.D. PARKER, and HALL, Circuit Judges.

B.D. PARKER, JR. Circuit Judge.

Island Def Jam Music Group ("IDJ") and Lyor Cohen, an IDJ principal, appeal from a judgment of the United States District Court for the Southern District of New York (Marrero, *J.*) in favor of TVT Records and TVT Music, Inc. (collectively "TVT"). Following a failed venture to produce and promote a series of recordings, TVT sued IDJ and Cohen on contract, tort and copyright claims. The jury awarded $25 million in compensatory and $107 million in punitive damages, an amount the court remitted to a total of $54 million. Because we conclude that TVT's tortious interference and fraudulent concealment claims had no legally sufficient evidentiary basis and that, as a matter of law, TVT was not entitled to assert a copyright claim, we reverse the judgment and set aside the awards on these grounds. Because we also conclude that punitive damages were not recoverable for the breach of contract proved at trial, we reverse that award as well.

## Background

This litigation arose from a contractual dispute between IDJ and TVT over the right to produce and market recorded music performances by a group known as Cash Money Click ("CMC"). Except as noted, the facts are undisputed. IDJ and TVT are both major players in the recording industry. TVT, founded in 1985, is the nation's largest independent record label. It produces and distributes the works of a number of highly successful hip-hop artists. IDJ is a division of Universal Music Group Recordings, Inc., the world's largest record company.

Irving Lorenzo of IDJ, known professionally as Irv Gotti, is one of the industry's most successful hip-hop producers. He began his career as a talent scout at TVT in the early 1990s and a few years later recruited CMC to TVT. CMC's members were Christopher Bristole, Otha Miller and Jeffrey Atkins, professionally known as Ja Rule. All were relatively obscure at that time. CMC subsequently signed an exclusive recording contract with TVT in 1994 (the "1994 Agreement"). The group recorded a number of songs, most of which were not released, and no albums incorporating the songs were produced. In 1996, Gotti left TVT and joined IDJ.

Ja Rule was released from his contractual obligations to TVT in 1994 and eventually followed Gotti to IDJ, signing an exclusive recording contract in 1998. Although TVT retained no rights to any of Ja Rule's new recordings after 1994, it still owned the rights to old CMC masters that had been made while Ja Rule was under contract to TVT.

Ja Rule's relationship with IDJ was highly successful, and he evolved into one of the recording industry's major stars. Gotti's career also flourished at IDJ. Serving as producer, co-producer, or executive producer, he released a series of enormously successful albums for numerous major hip-hop artists such as Jay Z, Ja Rule and DMX. In 1999, Gotti entered a joint venture with IDJ to form a record label, Murder, Inc., through which Gotti would produce records by various artists, including Ja Rule.

In early 2001, despite Ja Rule and Gotti's exclusive recording contract with IDJ, TVT approached Ja Rule and Gotti about reuniting CMC for a new album. Although Lyor Cohen, IDJ's chairman, was reluctant to give IDJ's consent to a new CMC album produced by TVT, he found himself in an awkward predicament. He felt the need to accommodate Ja Rule and Gotti, who were in the midst of renegotiating both the Murder, Inc. joint venture agreement and the terms of Ja Rule's future recordings with IDJ. Cohen was concerned that a failure to accommodate Ja Rule's request to do the CMC project might, at this fragile time, impair IDJ's relationship with Gotti and perhaps alienate Ja Rule. The discussions culminated in a Heads of Agreement ("HOA") signed by TVT, Ja Rule and Gotti—both on his own behalf and on behalf of Murder, Inc. The HOA called on Gotti to produce a CMC album containing eight new songs and four remixes of CMC's earlier, never-released recordings. The HOA further provided that TVT would receive fifty percent of the profits from the new venture and would own the copyrights to all the masters. However, since IDJ had exclusive contracts with Ja Rule and Gotti, the agreement was subject to IDJ's consent and the HOA itself appeared to contemplate IDJ's ultimate role in "sign[ing]-off on this [agreement] signifying its acceptance and agreement thereto."

IDJ contends that, as leverage to secure its consent, TVT threatened to release the old CMC masters to coincide with the re-

lease of IDJ's next Ja Rule album and that Ja Rule and Gotti were, in part, motivated to assist the careers of the two former, comparatively less successful, CMC members. Nevertheless, Gotti and Ja Rule warranted in the HOA that they had "the right, power and authority to enter into and perform the [HOA's] terms and conditions," and "indemnifie[d] and h[e]ld[ ] TVT harmless of and from any claims by any third parties that TVT's exploitation of the Album ... infringe upon or violate the rights of any such party."

Negotiations commenced and resulted in a Side Letter Agreement ("SLA") dated September 2001 between IDJ and TVT, Gotti and Ja Rule. Under the SLA, IDJ agreed "to comply with and honor all of the terms and conditions set forth in the [HOA] (as same pertains to or affects [IDJ]) and to permit 'Ja Rule', Murderers Inc.[sic] and Irv Gotti to perform for [TVT] and grant to [TVT] the rights set forth in the [HOA]." The SLA also modified the profit distribution formula in the HOA. Instead of fifty percent, TVT would receive forty percent, Gotti, Ja Rule and Murder, Inc. would together receive thirty percent, and IDJ would receive thirty percent. The SLA was signed on behalf of IDJ by Jeffrey Kempler, senior vice president of business and legal affairs at IDJ, but was not returned to TVT. TVT's lawyer William Leibowitz, Esq. became concerned when he did not receive IDJ's executed copies of the SLA and, in November 2001, contacted IDJ's lawyers. They assured Leibowitz that the deal was final, but still did not forward executed copies to TVT. Later that month, Leibowitz took the precautionary step of writing IDJ to place it on notice that TVT was relying on IDJ's assurances regarding its commitment to the SLA and that TVT was proceeding on that basis. IDJ did not respond to the letter.

Sometime after execution of the HOA by Gotti and Ja Rule in October 2001, TVT, Ja Rule and Gotti began to perform obligations imposed by the HOA. The signing of the HOA triggered a $400,000 advance payment from TVT to Gotti and Ja Rule, and the artists began recording new CMC tracks and remixing old ones. In the spring of 2002, Gotti, Murder, Inc. and TVT developed promotional materials for the album, including a teaser DVD and CD featuring two of the remastered CMC tracks released by IDJ. In this regard, IDJ obtained oral and written licenses for the songs "The Rain" and "Get Tha Fortune," respectively, from TVT. A release date was set for the fall of 2002.

TVT's theory, which it successfully pursued at trial, was that IDJ and Cohen never really intended to cooperate on the new TVT album and, in fact, intended to sabotage it. They initially consented to the CMC project in order to gain time to renegotiate an extension of Gotti's contract, which was expiring at the end of 2001. Because Cohen knew he could not alienate Gotti during this period, he accommodated Gotti and Ja Rule's desire to produce (at TVT's expense) a new CMC album. Once Gotti was re-signed in December 2001, IDJ proceeded, through a variety of steps, to kill the album. According to TVT, IDJ promised Gotti and Ja Rule that it would pay additional compensation if they could deliver the TVT-owned CMC masters to IDJ for release. IDJ, at the same time, moved up the release date for Ja Rule's next IDJ album from early 2003 to November 2002 to compete with, and presumably detract attention from, the new CMC album. To cap things off, in August 2002, IDJ finally responded to TVT's request of ten months earlier for the executed copy of the SLA by rejecting it, forbidding TVT from exploiting Ja Rule's services and informing TVT that it

could not proceed with the release of the CMC album.

Faced with the prospect of losing the potentially valuable CMC album and having IDJ issue its own Ja Rule album that might include old CMC music, TVT sued IDJ, asserting a number of claims that have survived to this appeal. TVT claimed for breach of contract, contending that IDJ breached the SLA by repudiating it after agreeing to execute it and instructing Murder, Inc., Gotti and Ja Rule not to deliver the CMC album to TVT. It claimed that IDJ tortiously interfered with Ja Rule and Gotti's performance under the HOA and under CMC's 1994 Agreement with TVT when IDJ and Cohen caused Murder, Inc., Gotti and Ja Rule not to deliver the CMC album as required under the HOA. TVT also claimed that IDJ and Cohen fraudulently induced other CMC members to violate the 1994 Agreement by engaging in unauthorized performances released by IDJ. TVT asserted a fraud claim based on allegedly false statements on behalf of IDJ at the behest of Cohen. The statements confirmed to TVT that IDJ agreed to TVT's production of the CMC Album pursuant to the SLA. Finally, TVT claimed for willful copyright infringement on the theory that IDJ and Cohen fraudulently obtained permission from TVT to use two CMC songs on the Summer 2002 teaser as a reciprocal courtesy for IDJ's agreeing to the CMC project.

Following a bifurcated trial, the jury found IDJ liable for breach of contract, in effect concluding that IDJ had entered into an oral contract embodying the SLA. The jury also found the defendants jointly and severally liable for tortious interference with the HOA, fraudulent concealment and copyright infringement. Subsequently, the jury assessed compensatory and punitive damages of approximately $132 million.

IDJ then moved under Rule 50(b) for judgment as a matter of law and under Rule 59 for a new trial or remittitur. Fed. R.Civ.P. 50(b), 59. IDJ succeeded only in obtaining a remittitur of a substantial amount of the punitive damages, thereby reducing the total judgment to approximately $54 million. Specifically, the court reduced the punitive damages awards against both IDJ and Cohen on the tortious interference claims from $50 million each to $25 million and $2 million, respectively, and against Cohen on the fraud claims from $6 million to $1 million.[1] This appeal ensued.[2]

## Discussion

As their principal grounds for relief on appeal, IDJ and Cohen contend that the District Court erred in denying their posttrial motions on TVT's claims for tortious interference, fraudulent concealment and copyright infringement, and in permitting any punitive damages to survive the motion for remittitur. We review *de novo* the District Court's denial of a motion for judgment as a matter of law. *Bracey v.*

---

1. *See TVT Records v. Island Def Jam Music Group*, 279 F.Supp.2d 413, 461 (S.D.N.Y. 2003) (granting IDJ's motion for remittitur). TVT elected to remit its award of punitive damages to these amounts, rather than accept a new trial, and subsequently applied for, and received, attorneys' fees under section 505 of the Copyright Act, 17 U.S.C. § 505. *See TVT Records v. Island Def Jam Music Group*, 288 F.Supp.2d 506, 512 (S.D.N.Y.2003) (granting attorneys' fees).

2. The appeal is limited to liability on the tortious interference, fraudulent concealment, and copyright claims, as well as any punitive damages awarded on those claims and on the breach of contract claim. IDJ does not appeal the award to TVT of $126,720 as compensatory damages for breach of contract.

*Bd. of Educ. of Bridgeport,* 368 F.3d 108, 113 (2d Cir.2004) (citation omitted) (RJC, RDS, Gibson). In so doing, "the question is always whether, after drawing all reasonable inferences in favor of the non-moving party and making all credibility assessments in [the non-movant's] favor, there is sufficient evidence to permit a rational juror to find in [the non-movant's] favor." *Id.* (citation omitted). We also review *de novo* questions of law such as the legal viability of TVT's copyright claim. *Cf. Infinity Broadcast Corp. v. Kirkwood,* 150 F.3d 104, 107 (2d Cir.1998) (district court's rejection of a fair use defense to copyright infringement is subject to *de novo* review).

For the reasons set forth below, we conclude that TVT's claims for tortious interference and for fraudulent concealment fail for lack of a legally sufficient evidentiary basis. We also conclude that TVT is not entitled to assert a claim for copyright infringement without having rescinded the licenses on which its infringement claim is based. Accordingly, we reverse the finding of liability and set aside the damages awarded on those claims.[3] Finally, we set aside the award of punitive damages based on breach of the SLA be-cause punitive damages are not recoverable for breach of contract where, as here, the wrongful conduct is not directed at the public at large.

## A. Tortious Interference

Under New York law, a tortious interference claim requires a showing that a valid contract exists and that a third party with knowledge of the contract intentionally and improperly procured its breach. *Finley v. Giacobbe,* 79 F.3d 1285, 1294 (2d Cir.1996). An important qualification exists: One asserting a tortious interference claim must also show that the defendant was not a party to the contract with which he allegedly interfered. *Id.* at 1295; *accord Winicki v. City of Olean,* 203 A.D.2d 893, 611 N.Y.S.2d 379, 380 (4th Dep't 1994). For this reason, the viability of TVT's tortious interference claim depends on whether IDJ was a party or a stranger to the HOA.[4] IDJ claims that the SLA and the HOA were a single contract and that, because the jury implicitly found that an oral agreement embodying the SLA had been created, IDJ was necessarily a party to the HOA. Consequently, IDJ could not have tortiously interfered with

---

3. As a result of our reversal of liability on the tortious interference and fraudulent concealment claims, we need not reach the issues raised by appellants regarding the damages awarded on those claims.

4. We find TVT's perfunctory contention that appellants failed to preserve this argument on appeal to be without merit. To the contrary, we are satisfied that they raised it at a number of critical junctures during District Court proceedings. The argument was unambiguously raised in defendants' reply memorandum in further support of their summary judgment motion and in their pre-trial memorandum. They unsuccessfully requested a jury instruction to the effect that they could not be liable for tortious interference if the jury were to find that IDJ was a party to the HOA. The point was also made in their an-swer to the amended complaint and in the joint pre-trial order. We are not troubled by the fact that the defendants did not reiterate this claim in their Rule 50(a) motion because the court and the plaintiffs received multiple notices of, and a full opportunity to meet, the argument. Significantly, the District Court had already rejected the argument in its opinion denying summary judgment. *See TVT Records v. Island Def Jam Music Group,* 244 F.Supp.2d 263, 275 (S.D.N.Y.2003). Moreover, we also note that the District Court saw fit to dispose of the argument in its denial of the appellants' Rule 50(a) motion. *See TVT Records,* 2003 WL 1858151, at *4 (S.D.N.Y. Apr. 9, 2003). Defendants' obligation was to give clear notice, not to make pests of themselves.

Gotti's and Ja Rule's performance under the HOA.[5] Blue Cohen 6; Blue IDJ 22.

TVT, on the other hand, contends that during pretrial proceedings the court below correctly identified the question of whether the HOA and the SLA were separate agreements as one of fact. TVT also contends that the jury was specifically instructed that it could not find defendants liable for tortious interference unless it found that the parties intended the HOA and the SLA to be separate contracts. Consequently, the jury's finding that IDJ and Cohen committed tortious interference was conclusive of whether the agreements were separate since it was sufficiently grounded in the evidence.

■ No one disputes that "[w]hether multiple writings should be construed as one agreement depends upon the intent of the parties," *Commander Oil Corp. v. Advance Food Serv. Equip.*, 991 F.2d 49, 52–53 (2d Cir.1993), an issue which is typically a question of fact for the jury, *Rudman v. Cowles Communications, Inc.*, 30 N.Y.2d 1, 13, 330 N.Y.S.2d 33, 280 N.E.2d 867 (1972). But if the documents in question reflect no ambiguity as to whether they should be read as a single contract, the question is a matter of law for the court. *See, e.g., Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 232 F.3d 153, 157–58 (2d Cir.2000). Under New York law, "all writings which form part of a single transaction and are designed to effectuate the same purpose [must] be read together, even though they were executed on different dates and were not all between the same parties." *This is Me,*

*Inc. v. Taylor*, 157 F.3d 139, 143 (2d Cir. 1998); *accord Nau v. Vulcan Rail & Constr. Co.*, 286 N.Y. 188, 197, 36 N.E.2d 106 (1941).

■ We think it is sufficiently clear that the HOA and SLA are one agreement and that there was nothing for the jury to decide. The HOA and the SLA were intended to effectuate the same result: the production and release of a CMC album containing older music owned by TVT and newer music to be recorded and produced by IDJ, Ja Rule and Gotti. IDJ was obligated under the SLA to "honor all of the terms and conditions set forth in the [HOA] (as same pertains to or affects you) and to permit 'Ja Rule', Murderers Inc. [sic] and Irv Gotti to perform for us and grant to us the rights set forth in the [HOA]." The HOA expressly contemplated IDJ's eventual participation in the project since Ja Rule and Gotti were to receive payments from TVT once IDJ "sign[ed]-off on this Heads of Agreement signifying its acceptance and agreement thereto." Moreover, the SLA modified the profit distribution formula in the HOA to provide significant payments directly to IDJ. Since the SLA is meaningless without the HOA, IDJ is a participant, not a stranger, and the "interference" that IDJ was found by the jury to have engaged in constituted nothing more than a breach of the SLA—and, by its terms, the HOA. *See Finley,* 79 F.3d at 1295; *Winicki,* 611 N.Y.S.2d at 380.

TVT contends that the HOA and the SLA are separate because the evidence established that the parties intended that they would be read separately, they were

---

**5.** Appellants also argue that IDJ is not a stranger to the HOA because IDJ and Gotti were co-owners of Murder Inc. as equal partners. Under this theory, appellants contend that IDJ cannot be liable for tortious interference with the HOA because IDJ was a party to the contract by virtue of its fifty percent stake in Murder Inc. Since we conclude that IDJ was not a stranger to the agreement on the ground that the SLA and HOA must be read together as a single contract, we do not reach this argument.

negotiated and signed at different times, memorialized in different documents and involved different parties. While these factors are pertinent to the "separate contracts" determination, they do not address the legally operative question: whether the contracts were part of a single transaction intended to effectuate the same purpose. *See This is Me. Inc.*, 157 F.3d at 143–46; *Gordon v. Vincent Youmans, Inc.*, 358 F.2d 261, 263 (2d Cir.1965). We believe they were.

TVT also contends that the HOA and SLA were separate contracts because they were not mutually dependent—that is, the breach of one did not undo obligations imposed by the other. *See Commander Oil Corp.*, 991 F.2d at 53 (inquiry is whether "the parties assented to all the promises as a whole, so that there would have been no bargain whatever if any promise or set of promises had been stricken") (quoting 6 *Williston on Contracts* § 863, at 279–80 (3d ed. W. Jaeger 1962)). We believe this argument is simply wrong. It is undisputed that the CMC project would not, and could not, have proceeded without IDJ's execution of the SLA (Gray Cohen 11); indeed, it was IDJ's breach that caused the demise of the project. Put another way, if IDJ's promises had been "stricken" from the SLA, there "would have been no bar-

gain whatever." 6 *Williston on Contracts* § 863, at 279–80. It is of no moment that the HOA also contained certain obligations (e.g. the performers' obligation to indemnify TVT against claims arising from the CMC album) that were not affected by the SLA. The test is whether the documents were intended as a single agreement, not whether they imposed congruent obligations. The conclusion is inescapable that the SLA and HOA were meant to be read together as a single contract, and therefore IDJ was not a stranger to the agreement. Accordingly, we reverse the judgment for TVT on its tortious interference claim against IDJ and Cohen.

## B. Fraudulent Concealment

■ IDJ and Cohen also contend that the District Court erred in denying its motion for judgment as a matter of law with respect to TVT's fraudulent concealment claim (that IDJ failed to disclose that it never intended to perform its obligations under the SLA) because, under New York law, the failure to disclose an intention to breach is not actionable as a fraudulent concealment. We agree.[6]

■ Under New York law, fraudulent concealment requires proof of: (1) failure to discharge a duty to disclose; (2) an

---

**6.** As with the tortious interference issue, TVT contends that appellants waived this argument by not properly asserting it below in their Rule 50(a) motion. This contention is without merit. The District Court's finding of waiver notwithstanding, appellants argued, in their oral Rule 50(a) motion:

> The fraud claim is nothing more than an effort to get around the fact that there was no breach of contract. It's dressing up a breach of contract claim in an aggravated description of what went on here. They are trying to circumvent the law of contract and impose fraud liability when there is no contract.

Tr. of 3/17/02, at 1615 (emphasis added). In addition to arguing that there was no contract

(which the jury did not credit), appellants also argued that TVT's fraud claim was duplicative of its contract claim, which subsumes the question of whether they had a duty to disclose their intention to breach the SLA.

Apparently, it was also clear to the District Court, which, in ruling on appellants' Rule 50(b) motion, disposed of the argument by reference to its earlier denial of summary judgment with no mention of waiver (while finding other of appellants' arguments that were not raised in the Rule 50(a) motion waived). *See TVT Records v. Island Def Jam Music Gp.*, 279 F.Supp.2d 366, 378, 380 (S.D.N.Y.2003).

intention to defraud, or scienter; (3) reliance; and (4) damages. *Brass v. Am. Film Tech., Inc.*, 987 F.2d 142, 152 (2d Cir.1993). In the context of a business transaction, the duty to disclose arises where a party, with a duty to be complete, has made only a partial or ambiguous statement, or "where one party possesses superior knowledge, not readily available to the other, and knows that the other is acting on the basis of mistaken knowledge." *Id.* at 150 (citation omitted), *accord Young v. Keith,* 112 A.D.2d 625, 492 N.Y.S.2d 489, 491 (3d Dep't 1985). However, the intention to breach does not give rise to a duty to disclose. Instead, the duty to disclose must exist separately from the duty to perform under the contract. *See Bridgestone/Firestone v. Recovery Credit Servs., Inc.,* 98 F.3d 13, 20 (2d Cir.1996) ("To maintain a claim of fraud in such a situation, a plaintiff must either: (i) demonstrate a legal duty separate from the duty to perform under the contract; or (ii) demonstrate a fraudulent misrepresentation collateral or extraneous to the contract; or (iii) seek special damages that are caused by the misrepresentation and unrecoverable as contract damages.") (internal citations omitted); *Caniglia v. Chicago Tribune–N.Y. News Syndicate, Inc.,* 204 A.D.2d 233, 612 N.Y.S.2d 146, 147 (1st Dep't 1994) ("[A] cause of action for fraud does not arise, where ... the only fraud alleged merely relates to a contracting party's alleged intent to breach a contractual obligation.").

Here, TVT alleged—and presented evidence at trial—that during the course of the parties' relationship, IDJ and Cohen not only planned to breach the SLA by revoking the waiver of Gotti's and Ja Rule's exclusivity, but also planned to, and did, use the existence of the SLA to achieve at least two collateral aims: (1) to help lure Gotti into re-signing with IDJ; and (2) to lure TVT and CMC into creating new masters which IDJ would then appropriate for itself. We have held that in a situation where a defendant fails to disclose an intention not to perform a promise in the future, one of the ways a plaintiff can maintain a fraud claim under New York law is by also demonstrating "a fraudulent misrepresentation collateral or extraneous to the contract." *Bridgestone/Firestone,* 98 F.3d at 20; *see also Deerfield Communications Corp. v. Chesebrough–Ponds, Inc.,* 68 N.Y.2d 954, 510 N.Y.S.2d 88, 502 N.E.2d 1003 (1986) (refusing to dismiss fraud claim alleging "a misrepresentation of present fact, not of future intent" which misrepresentation was "collateral to, but which was the inducement for the contract" and thus not duplicative of contract claim) (citations and internal quotation marks omitted).

However, the non-disclosure of collateral aims, such as those alleged by TVT, do not constitute actionable "fraudulent misrepresentation[s] collateral or extraneous to the contract." *Bridgestone/Firestone,* 98 F.3d at 20. Although TVT alleged collateral aims, the aims proved at trial were not distinct fraudulent misrepresentations but, rather, were allegations about defendants' states of minds used to support the contention that they intended to breach the contract (i.e. the motives for the breach). Thus, the fraudulent concealment claim is insufficiently distinct from the breach of contract claim to be viable. *See Contemporary Mission, Inc. v. Bonded Mailings, Inc.,* 671 F.2d 81, 85 (2d Cir.1982) (holding that "[i]f the only interest involved ... is holding a party to a promise, a plaintiff will not be permitted to transform the contract claim into one for tort."); *Clark–Fitzpatrick, Inc. v. Long Island R. Co.,* 70 N.Y.2d 382, 389–90, 521 N.Y.S.2d 653, 516 N.E.2d 190 (1987) (holding that causes of action sounding in negligence were properly dismissed where plaintiff has not alleged

the violation of a legal duty independent of the contract because "[i]t is a well-established principle that a simple breach of contract is not to be considered a tort unless a legal duty independent of the contract itself has been violated. This legal duty must spring from circumstances extraneous to, and not constituting elements of, the contract, although it may be connected with and dependent upon the contract.").[7]

TVT relies principally on *Brass* to support its contention that it proved a claim for fraudulent concealment, but *Brass* cannot bear this weight. In *Brass*, we held that where a securities broker failed to inform a buyer that securities offered for sale were encumbered, and where the broker knew that such information was unknown to the buyer and would likely have caused him not to purchase the securities, the seller could be liable for fraudulent concealment. *Brass*, 987 F.2d at 152. The issue in *Brass* was not that the seller never intended to perform the contract; on the contrary, the seller followed through with the sale and delivered the securities. The issue, instead, was that the seller concealed a material defect in the product it sold. *Id.* at 152. We analogized *Brass* to *Donovan v. Aeolian Co.*, 270 N.Y. 267, 200 N.E. 815 (1936), where the New York Court of Appeals held that a piano manufacturer fraudulently concealed a material fact when selling a used and rebuilt piano because the salesman was silent regarding the fact that the piano in the showroom was used and partially rebuilt, and the manner in which the instrument was displayed implied that it was new. *Brass*, 987 F.2d at 152 (citing *Donovan*, 270 N.Y. at 270–71, 200 N.E. 815).

Here, IDJ did not conceal any information that, if known by TVT, would have made its obligations under the SLA less valuable to TVT. It simply failed to perform. As a result, contract damages are available to TVT, but not tort damages sounding in fraud. Accordingly, TVT's claim for fraudulent concealment fails.

## C. Copyright Infringement

Appellants argue that since TVT's fraudulent concealment claim was duplicative of its breach of contract claim, and was otherwise the only fraud-related theory accepted by the jury, there was no legal basis for the jury's finding that IDJ infringed TVT's copyrights in "The Rain" and "Get Tha Fortune" by fraudulently obtaining licenses to, and later publishing, those works.[8]

We agree that the copyright verdict and damages award cannot stand as a matter of law, but not for the reason advanced by IDJ and Cohen. Instead, we hold that the

---

7. *See also Guterman v. RGA Accessories, Inc.*, 196 A.D.2d 785, 602 N.Y.S.2d 116, 117 (1st Dep't 1993) ("As the only fraud alleged relates to the breach of contract, the mere addition of allegations of scienter does not give rise to a cause of action seeking damages for fraud."); *Metropolitan Transp. Auth. v. Triumph Adver. Prod.*, 116 A.D.2d 526, 497 N.Y.S.2d 673, 675 (1st Dep't 1986) (dismissing fraud claim based on fraudulent misrepresentation collateral to the contract because "none of [plaintiff's] allegations [we]re distinct from those giving rise to the breach of contract claim and relate[d] to facts collateral and extraneous to the contract"). *Cf. Grappo v. Alitalia Linee Aeree Italiane, S.p.A.*, 56 F.3d 427, 434 (2d Cir.1995) (holding that plaintiff stated a fraud claim where he alleged that defendant engaged in fraud independent of the contract but acknowledging that "[a] cause of action for fraud does not generally lie where the plaintiff alleges only that the defendant entered into a contract with no intention of performing.").

8. We note that when the trial court denies a Rule 50 motion, both that denial and "errors of law in the trial court may be raised on appeal." 9A C. Wright & A. Miller, *Federal Practice & Procedure*, § 2540, at 373 (1995).

District Court mistakenly concluded that "[a] fraudulently induced copyright license is invalid" *ipso facto.* *TVT Records,* 244 F.Supp.2d at 269 (summary judgment motion) (cited in *TVT Records,* 279 F.Supp.2d at 381 (Rule 50(b) motion)). This conclusion overlooks the fact that the license must formally be rescinded before an infringement action based on fraudulent inducement of a copyright license can proceed. *See Graham v. James,* 144 F.3d 229, 237–38 (2d Cir.1998) ("A material breach of a covenant will allow the licensor to rescind the license and hold the licensee liable for infringement for uses of the work thereafter," but "rescission [does] not occur automatically . . . ."); *see also, Jacob Maxwell, Inc. v. Veeck,* 110 F.3d 749, 753 (11th Cir.1997) ("One party's breach [of an oral, nonexclusive license to play a song] does not automatically cause recision of a bilateral contract"); *Rano v. Sipa Press, Inc.,* 987 F.2d 580, 586 (9th Cir.1993) ("Although licensing agreements are not terminable at will, under federal and state law a material breach of a licensing agreement gives rise to a right of rescission which allows the nonbreaching party to terminate the agreement. After the agreement is terminated, any further distribution would constitute copyright infringement.") (internal citations omitted); 3 *Nimmer on Copyright* § 10.15[A] (6th ed. 1978) ("Rescission may also be based on fraud in the inducement to execute the assignment," but "[f]ailing such rescission, . . . the grant continues in place, thus pre-

cluding infringement liability until such time as the copyright owner exercises his entitlement to rescind.").

TVT has neither sued for rescission of the licenses nor alleged the breach of any covenant related to their grant. Accordingly, it cannot now recover for copyright infringement. Therefore, we reverse the judgment of liability and set aside the damages award and the attorneys' fees on TVT's copyright infringement claim. *See* 17 U.S.C. § 505.

*D. Punitive Damages.*

Finally, IDJ has appealed the punitive damages awarded on TVT's breach of contract claim,[9] on the ground that New York law only permits such an award when a defendant's conduct is "part of a pattern directed at the public generally," a requirement not satisfied in this case.[10] *New York Marine & Gen. Ins. Co. v. Tradeline (L.L.C.),* 266 F.3d 112, 130 (2d Cir.2001) (quoting *New York Univ. v. Cont'l Ins. Co.,* 87 N.Y.2d 308, 316, 639 N.Y.S.2d 283, 662 N.E.2d 763 (1995)). The District Court acknowledged the existence and vitality of this rule, but discerned a "narrow exception" from two Appellate Division cases. *TVT Records,* 262 F.Supp.2d at 195–96 (discussing *Aero Garage Corp. v. Hirschfeld,* 185 A.D.2d 775, 586 N.Y.S.2d 611 (1st Dep't 1992), and *Williamson, Picket, Gross, Inc. v. Hirschfeld,* 92 A.D.2d 289, 460 N.Y.S.2d 36 (1983) (1st Dep't 1983)). It concluded that punitive dam-

---

**9.** IDJ has also appealed from the punitive awards on TVT's tortious interference and fraudulent concealment claims, but our reversal on those claims renders those damages issues moot.

**10.** New York law also requires that the defendant's conduct be (1) "actionable as an independent tort; (2) . . . of [an] egregious nature; [and] (3) . . . directed to plaintiff," before punitive damages for breach of contract can be awarded. *New York Marine,* 266 F.3d at 130.

Apart from the fact that appellants' conduct was not aimed at the general public, our dismissal of TVT's tort claims necessarily means that appellants' conduct was not "actionable as an independent tort." This additional reason also warrants setting aside the award of punitive damages on TVT's contract claim. *See Canelle v. Russian Tea Room Realty LLC,* 2002 WL 287750 (S.D.N.Y. Feb. 27, 2002), 2002 U.S. Dist. LEXIS 3169, at *24.

ages might be available on a contract claim, absent conduct directed at the public,

> where the plaintiff establishes a sufficiently high degree of bad faith by the defendant evincing disingenuous or dishonest failure to carry out contractual obligations, thus frustrating the plaintiff's rights to an aggravated extent, particularly where bad faith is apparent at or near the outset of the transaction and where the breached obligations are unambiguous.

*Id.* at 196.

We are not persuaded that this exception is sound. For one thing, neither the *Aero Garage* court nor the *Williamson* court characterized what it was doing as carving out an exception to the general public aim requirement. Both cases relied on an earlier Court of Appeals case that approved punitive damages for a "bad faith" breach of contract, without purporting to craft an exception to, or even discussing, the public aim requirement. *See Aero Garage*, 586 N.Y.S.2d at 613 (citing *Gordon v. Nationwide Mut. Ins. Co.*, 30 N.Y.2d 427, 437, 334 N.Y.S.2d 601, 285 N.E.2d 849 (1972)); *Williamson*, 460 N.Y.S.2d at 41 (same).[11] In other words, *Aero Garage* and *Williamson* were decided at a time when New York law was at best ambiguous as to whether conduct directed at the general public was necessary to recover for breach of contract. *Compare Gordon*, 30 N.Y.2d at 437, 334 N.Y.S.2d 601, 285 N.E.2d 849 (noting that "[t]he punitive nature of damage for the bad faith breach of contract is a characteristic of the law of contracts generally," without mentioning any public aim re-

quirement), *with Garrity v. Lyle Stuart, Inc.*, 40 N.Y.2d 354, 358, 386 N.Y.S.2d 831, 353 N.E.2d 793 (1976) ("It has always been held that punitive damages are not available for mere breach of contract, for in such a case only a private wrong, and not a public right, is involved.").

The problem for TVT's theory is that two more recent New York Court of Appeals cases call into question the continued validity of the rule in *Gordon,* as applied in *Aero Garage* and *Williamson.* In *Rocanova v. Equitable Life Assurance Society of the United States,* 83 N.Y.2d 603, 612 N.Y.S.2d 339, 634 N.E.2d 940 (1994), the Court of Appeals, after reviewing this precedent, concluded that "[p]unitive damages are not recoverable for an ordinary breach of contract as their purpose is not to remedy private wrongs but to vindicate public rights," but that such damages were recoverable when the breach also involved a particularly egregious fraud that "was aimed at the public generally." *Id.* at 613, 612 N.Y.S.2d 339, 634 N.E.2d 940 (internal quotation marks omitted). In *New York University v. Continental Insurance Co.,* 87 N.Y.2d 308, 639 N.Y.S.2d 283, 662 N.E.2d 763 (1995), decided the following year, the Court of Appeals made it even more clear that punitive damages were recoverable in a contract action only "if necessary to vindicate a public right." *Id.* at 315, 639 N.Y.S.2d 283, 662 N.E.2d 763 (citing *Rocanova,* 83 N.Y.2d at 613, 612 N.Y.S.2d 339, 634 N.E.2d 940). This rule has not been changed by the Court of Appeals, and we have no reason to question its continued vitality.[12]

We do not believe that IDJ's conduct in breaching the SLA was aimed at the public

---

**11.** *Gordon* held that in order to trigger punitive damages, "bad faith require[d] an extraordinary showing of a disingenuous or dishonest failure [by the defendant] to carry out a contract." *Gordon,* 30 N.Y.2d at 437, 334 N.Y.S.2d 601, 285 N.E.2d 849.

**12.** The contrary decisions of a handful of district courts within this Circuit, *e.g., Bonnie & Co. Fashions v. Bankers Trust Co.,* 945 F.Supp. 693, 711 (S.D.N.Y.1996), as well as a single Appellate Division panel, *see Suffolk Sports Ctr. Inc. v. Belli Constr. Corp.,* 212

generally. The District Court held that even if the public aim requirement applied, IDJ's hurried and haphazard attempt to deliver the CMC Album materials to TVT on the eve of trial "implicate[d] the judicial process," and therefore could be construed as "being directed at the public generally." *TVT Records,* 262 F.Supp.2d at 197. In addition, it held that IDJ's breach had an impact upon the public because it "impaired the creation and dissemination of a work of art that TVT intended to sell to the general public and which it had already advertised to the public at large." *Id.*

These incidental effects of IDJ's conduct do not constitute conduct directed at the public generally. When the Court of Appeals articulated the public aim requirement in *Rocanova* and more recently in *New York University,* it invoked an earlier

distinction between "a gross and wanton fraud upon the public" and "an isolated transaction incident to an otherwise legitimate business." *Walker v. Sheldon,* 10 N.Y.2d 401, 406, 223 N.Y.S.2d 488, 179 N.E.2d 497 (1961). The latter, it implied, would not constitute conduct aimed at the public generally. *Id.* The conduct involved in this case—IDJ's scuttling of the CMC project by breaching its obligations under the SLA—hewed more to the "isolated transaction incident to an otherwise legitimate business" than to the "gross and wanton fraud upon the public" required by *Walker.*

Our decision in *Merritt* confirms this view. 95 F.3d at 161. There we held that a defense contractor's failure to pay a subcontractor for work for which the contractor had been paid by the Army Corps of Engineers, as well as its fraud in securing a promissory note and confession of judg-

A.D.2d 241, 628 N.Y.S.2d 952, 955–56 (2d Dep't 1995), do not provide such a reason. In *Bonnie,* the court cites *New York University,* but misreads it to require egregious conduct *or* conduct aimed at the public before punitive damages can be assessed. 945 F.Supp. at 711. In *Suffolk Sports Center,* the court cites *Rocanova's* "public aim" requirement, but concludes nevertheless that defendant's actions against a private entity "were sufficiently reprehensible so as to warrant the imposition of punitive damages against it." 628 N.Y.S.2d at 955–56.

First, the other post-*Rocanova* Appellate Division panels to consider the question have uniformly applied its public aim precondition to the award of punitive damages. *See Colton, Hartnick, Yamin & Sheresky v. Feinberg,* 227 A.D.2d 233, 642 N.Y.S.2d 283, 284 (1st Dep't 1996) ("Punitive damages are not recoverable for an ordinary breach of contract as their purpose is not to remedy private wrongs but to vindicate public rights.") (internal citation and quotation marks omitted); *Bibeau v. Ward,* 228 A.D.2d 943, 645 N.Y.S.2d 107, 110 (3d Dep't 1996) ("Punitive damages [in contract claims] . . . are limited to those instances where it is necessary to vindicate a public right.") (internal citation and quotation

marks omitted); *Murray–Gardner Mgmt. Inc. v. Iroquois Gas Transmission Sys. L.P.,* 229 A.D.2d 852, 646 N.Y.S.2d 418, 420 (3d Dep't 1996) ("[P]laintiff's request for punitive damages was properly dismissed in the absence of a showing by plaintiff that defendant engaged in egregious tortious conduct toward it that was part of a pattern directed at the public generally.").

Second, this Court has not wavered in applying the public aim requirement since *Rocanova* was issued. *See New York Marine,* 266 F.3d at 130 (claim for punitive damages in contract actions failed because plaintiff did not allege that defendant's conduct was directed at the public); *United States v. Merritt Meridian Constr. Corp.,* 95 F.3d 153, 160 (2d Cir.1996) (punitive damages recoverable in contract action "if the conduct was aimed at the public generally"). *Cf. New Spectrum Realty Servs., Inc. v. Nature Co.,* 42 F.3d 773, 777 (2d Cir.1994) (declining to award punitive damages, but recognizing that New York's Appellate Division has awarded punitive damages for willful frustration of a plaintiff's rights under an unambiguous contract) (citing *Aero Garage Corp. v. Hirschfeld,* 185 A.D.2d 775, 586 N.Y.S.2d 611 (1st Dep't 1992)).

96

ment from the sub-contractor, did not "evince[ ] a pattern of conduct harming the general public." *Id.* We were not persuaded that conduct which could be characterized as defrauding the taxpayers and manipulating the judicial process had a sufficiently public component to support punitive damages. We reach a similar result here and set aside the award of punitive damages based on TVT's breach of contract. IDJ has not appealed the breach of contract award and remains liable for the $126,720 in compensatory damages awarded on that claim.

### Conclusion

We reverse the judgment and set aside the award of damages, as well as attorneys' fees, on TVT's tortious interference, fraudulent concealment and copyright infringement claims. We also set aside the jury's award of punitive damages on TVT's breach of contract claim. We remand to the District Court with instructions to enter judgment in conformity with this opinion.